## MAYNARD *v.* HILL.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF WASHINGTON.

No. 194. Argued February 16, 17, 1888. — Decided March 19, 1888.

A territorial statute of Oregon, passed in 1852, dissolving the bonds of matrimony between husband and wife, the husband being at the time a resident of the Territory, was an exercise of "the legislative power of the Territory upon a rightful subject of legislation," according to the prevailing judicial opinion of the country and the understanding of the legal profession at the time when the act of Congress establishing the territorial government was passed, August 14, 1848, 9 Stat. 323.

The general practice in this country of legislative bodies to grant divorces stated.

The granting of divorces being within the competency of the legislature of the Territory, its motives in passing the act in question cannot be inquired into. Having jurisdiction to legislate upon the status of the hus-

band, he being a resident of the Territory at the time, the validity of the
act is not affected by the fact that it was passed upon his application,
without notice to or knowledge by his wife; who, with their children,
had been left by him two years before in Ohio, under promise that he
would return or send for them within two years.

Marriage is something more than a mere contract, though founded upon
the agreement of the parties. When once formed, a relation is created
between the parties which they cannot change; and the rights and obli-
gations of which depend not upon their agreement, but upon the law,
statutory or common. It is an institution of society, regulated and con-
trolled by public authority. Legislation, therefore, affecting this insti-
tution and annulling the relation between the parties is not within the
prohibition of the Constitution of the United States against the impair-
ment of contracts by state legislation.

Nor is such legislation prohibited by the last clause of Article 2 of the Ordi-
nance of the Northwest Territory, declaring that " no law ought ever to
be made or have force in said Territory that shall in any manner what-
ever interfere with or affect private contracts or engagements *bona fide*
and without fraud, previously formed; " which clause was, by the organic
act of Oregon, enacted and made applicable to the inhabitants of that
Territory.

Under the Oregon Donation Act, 9 Stat. 496, c. 76, the statutory grant
took effect as a complete grant only on the termination of the four years'
term of residence and cultivation; and the wife of a resident settling
under the act as a married man, who was divorced from him after the
commencement of his settlement, but before its completion, took no
interest under the act in the title subsequently acquired by him. He had,
previous to that time, no vested interest in the land, only a possessory
right, — a right to remain on the land so as to enable him to comply with
the conditions upon which the title was to pass to him.

THE case, as stated by the court, was as follows:

This is a suit in equity to charge the defendants, as trustees
of certain lands in King County, Washington Territory, and
compel a conveyance thereof to the plaintiffs. The lands are
described as lots 9, 10, 13, and 14, of section 4 ; and lots 6, 7,
8, and 9, of section 5, in township 24 north, range 4 east,
Willamette meridian. The case comes here on appeal from a
judgment of the Supreme Court of the Territory, sustaining
the defendants' demurrer, and dismissing the complaint. The
material facts, as disclosed by the complaint, are briefly
these : In 1828 David S. Maynard and Lydia A. Maynard
intermarried in the State of Vermont, and lived there to-

gether as husband and wife until 1850, when they removed to Ohio. The plaintiffs, Henry C. Maynard and Frances J. Patterson, are their children, and the only issue of the marriage. David S. Maynard died intestate in the year 1873, and Lydia A. Maynard in the year 1879. In 1850 the husband left his family in Ohio and started overland for California, under a promise to his wife that he would either return or send for her and the children within two years, and that in the meantime he would send her the means of support. He left her without such means, and never afterwards contributed anything for her support or that of the children. On the 16th of September following he took up his residence in the Territory of Oregon, in that part which is  ʋw Washington Territory, and continued ever afterwards to reside there. On the 3d of April, 1852, he settled upon and claimed, as a married man, a tract of land of 640 acres, described in the bill, under the act of Congress of September 27, 1850, "creating the office of surveyor general of public lands in Oregon, and to provide for the survey, and to make donations to settlers of the said public lands," and resided thereon until his death.

On the 22d day of December, 1852, an act was passed by the Legislative Assembly of the Territory, purporting to dissolve the bonds of matrimony between him and his wife. The act is in these words:

"An act to provide for the dissolution of the bonds of matrimony heretofore existing between D. S. Maynard and Lydia A. Maynard, his wife.

"Sec. 1. Be it enacted by the Legislative Assembly of the Territory of Oregon, That the bonds of matrimony heretofore existing between D. S. Maynard and Lydia A. Maynard be, and the same are, hereby dissolved.

"Passed the House of Representatives Dec. 22d, 1852.

"B. F. HARDING,

"*Speaker of the House of Representatives.*

"Passed the Council Dec. 22d, 1852.

"M. P. DEADY,

"*President Council.*"

The complaint alleges that no cause existed at any time for this divorce; that no notice was given to the wife of any application by the husband for a divorce, or of the introduction or pendency of the bill for that act in the Legislative Assembly; that she had no knowledge of the passage of the act until July, 1853; that at the time she was not within the limits or an inhabitant of Oregon; that she never became a resident of either the Territory or State of Oregon; and that she never in any manner acquiesced in or consented to the act; and the plaintiffs insist that the Legislative Assembly had no authority to pass the act; that the same is absolutely void; and that the parties were never lawfully divorced.

On or about the 15th of January, 1853, the husband thus divorced intermarried with one Catherine T. Brashears, and thereafter they lived together as husband and wife until his death. On the 7th of November, 1853, he filed with the Surveyor General of Oregon the certificate required under the donation act of September 27, 1850, as amended by the act of the 14th of February, 1853, accompanied with an affidavit of his residence in Oregon from the 16th of September, 1850, and on the land claimed from April 3, 1852, and that he was married to Lydia A. Maynard until the 24th of December, 1852, having been married to her in Vermont in August, 1828. The notification was also accompanied with corroborative affidavits of two other parties that he had within their knowledge resided upon and cultivated the land from the 3d of April, 1852.

On the 30th of April, 1856, he made proof before the register and receiver of the land office of the Territory of his residence upon and cultivation of his claim for four years from April 3, 1852, to and including April 3, 1856. Those officers accordingly, in May following, issued to him, and to Catherine T. Maynard, his second wife, a certificate for the donation claim, apportioning the west half to him and the east half to her. This certificate was afterwards annulled by the Commissioner of the General Land Office, on the ground that, as it then appeared, and was supposed to be the fact,

Lydia A. Maynard, the first wife, was dead, and that her heirs were therefore entitled to half of the claim.

On a subsequent hearing before the register and receiver, the first wife appeared, and they awarded the east half of the claim to her and the west half to the husband. From this decision an appeal was taken to the Commissioner of the General Land Office, and from the decision of that officer to the Secretary of the Interior. The Commissioner affirmed the decision of the register and receiver so far as it awarded the west half to the husband, but reversed the decision so far as it awarded the east half to the first wife; holding that neither wife was entitled to that half. He accordingly directed the certificate as to the east half to be cancelled. The Secretary affirmed the decision of the Commissioner, holding that the husband had fully complied with all the requirements of the law relating to settlement and cultivation, and was therefore entitled to the west half awarded to him, for which a patent was accordingly issued. But the Secretary also held that, at the time of the alleged divorce, the husband possessed only an inchoate interest in the lands, and whether it should ever become a vested interest depended upon his future compliance with the conditions prescribed by the statute; that his first wife accordingly possessed no vested interest in the property. He also held that the second wife was not entitled to any portion of the claim, because she was not his wife on the first day of December, 1850, or within one year from that date, which was necessary, to entitle her to one-half of the claim under the statute; and the plaintiffs insist that the decision of the Commissioner and Secretary in this particular is erroneous, and founded upon a misapprehension of the law.

Subsequently the east half of the claim was treated as public land, and was surveyed and platted as such under the direction of the Commissioner of the General Land Office. The defendants Hill and Lewis, with full knowledge, as the bill alleges, of the rights of the first wife, located certain land scrip, known as Porterfield land scrip, upon certain portions of the land, and patents of the United States were issued to

them accordingly, and they are applicants for the remaining portion. The complaint alleges that the other defendant, Flagg, claims some interest in the property, but the nature and extent thereof are not stated.

Upon these facts the plaintiffs claim that they are the equitable owners of the lands patented to the defendants Hill and Lewis, and that the defendants are equitably trustees of the legal title for them. They therefore pray that the defendants may be adjudged to be such trustees, and directed to convey the lands to them by a good and sufficient deed; and for such other and further relief in the premises as to the court shall seem meet and equitable.

To this complaint the defendants demurred on the ground that it did not state facts sufficient to constitute a cause of action. The court sustained the demurrer, and gave judgment thereon in favor of the defendants. On appeal the Supreme Court of the Territory came to the same conclusion: that the complaint did not state a sufficient cause of action; that no grounds for relief in equity appeared upon it; and that the defendants' demurrer should be sustained. Judgment was accordingly entered that the complaint be dismissed. To review this judgment the case is brought to this court.

*Mr. C. H. Hanford* for appellants. *Mr. Henry Beard* was with him on the brief.

I. Maynard fulfilled the law so as to acquire a donation of 640 acres, one-half of which enured to his wife Lydia, as her donation, by the effect of the grant. *Stark* v. *Starrs*, 6 Wall. 402; *Barney* v. *Dolph*, 97 U. S. 652, 656; *Wirth* v. *Branson*, 98. U. S. 118; *Kansas Pacific Railway* v. *Atchison, Topeka, and Santa Fé Railroad*, 112 U. S. 414, 422; *Van Wyck* v. *Knevals*, 106 U. S. 360; *Walden* v. *Knevals*, 114 U. S. 373; *Missouri, Kansas, and Texas Railway* v. *Kansas Pacific Railway*, 97 U. S. 491.

The residence and cultivation are required of the settler only. His wife's title is completed when his is. *Van Dolf* v. *Otis*, 1 Oregon, 153; *Vance* v. *Burbank*, 101 U. S. 520;

*Davenport* v. *Lamb,* 13 Wall. 418; *Hall* v. *Russell,* 101 U. S. 503.

Where a *bona fide* settlement under the preëmption laws is made and those laws are fulfilled, the right of the claimant relates back to the date of the settlement, and cuts off intervening claims. In case of two conflicting donations arising after the grant, it seems quite clear that the *first settler,* all other things being equal, would have the better right. The title would relate back to the date of settlement. This proposition is and has been accepted by the local courts of Oregon, both the state and United States courts. *Lee* v. *Summers,* 2 Oregon, 260, 266; *Dolph* v. *Barney,* 5 Oregon, 190, 201; *Chapman* v. *School District,* Deady, 108, 113; *Lamb* v. *Davenport,* 1 Sawyer, 609, 632; *Adams* v. *Burke,* 3 Sawyer, 415.

II. As to the effect of the divorce law, if valid, upon the rights of Lydia, it is pertinent to remark that it did not attempt to deal with her donation, and it appears to be settled on principle that it could not have defeated the donation if the attempt had been made. We should not give it, therefore, an effect not only not intended, but impossible.

She had no notice of the proceedings of the legislature, no day in court to reply or reject, and if her property rights could be affected by those proceedings, she was entitled to notice under the fifth amendment of the Constitution of the United States, which provides that: " No person shall  .  .  . be deprived of life, liberty, or property without due process of law." As to what is "due process of law," see *Stuart* v. *Palmer,* 74 N. Y. 183, 191; Cooley on Const. Lim. 355.

But that statute was invalid, and the court below erred in deciding that it was valid, as will be seen on examining the current of the decisions in the courts of the United States.

*Starr* v. *Pease,* 8 Conn. 541, decided in 1831, is usually cited as the leading case on the side of the validity of legislative divorces. But the divorce in question in that case was not legislative, but judicial, although it was granted by the legislature. The record shows that the legislature in that case acted in a judicial capacity and proceeded strictly according to judicial forms, just as Parliament always has in grant-

ing divorces. (See the divorce act recited in the report of the case.) That decision does not maintain that the granting of a divorce is a legislative function, or that the marriage tie of a particular couple is a *rightful* subject of legislation, but it does hold that prior to the adoption of the state constitution of 1818 the legislature of Connecticut possessed all power, legislative and judicial, with only a few limitations; that the constitution of 1818 is not a grant of power, but a limitation of the powers previously belonging to the several branches of the government; that the legislature was not by that constitution divested of the power, which previously belonged to it, of granting divorces.

*Wright* v. *Wright*, 2 Maryland, 429; *S. C.* 56 Am. Dec. 723, decided in December, 1852, and *Cronise* v. *Cronise*, 54 Penn. St. 255, decided in 1867, are very similar to the case of *Starr* v. *Pease.* They hold that in those two States the legislatures, having prior to the adoption of their constitutions possessed power to grant divorces, still have the same power, except as curtailed or limited by those instruments. In the latter case it was held that the legislature could not grant a divorce in any case in which the courts would have jurisdiction.

In *Bingham* v. *Miller*, 17 Ohio, 445; *S. C.* 49 Am. Dec. 471, decided in 1848, the court emphatically decided the granting of divorces to be a judicial and not a legislative function, and that the legislature had no power to grant a divorce in any case, but out of regard for supposed unpleasant consequences to people not parties to the suit if effect should be given to the law, the court gave judgment as if the law were the reverse of what the court found.

*Crane* v. *Meginnis*, 1 G. & J. 463; *S. C.* 19 Am. Dec. 237, decided in 1829, was a suit to recover alimony awarded by an act of the legislature granting a divorce to the wife. Judgment was given for the defendant.

*Townsend* v. *Griffin*, 4 Harrington (Del.) 440, decided in 1846, was a suit to enforce a judgment lien by creditors of the husband against the wife's land after a divorce by the legislature of Delaware. The court refused to give plaintiffs the relief sought, but having doubts as to the validity of the divorce act refrained from deciding that question.

In *Gaines* v. *Gaines*, 9 B. Mon. 295; *S. C.* 48 Am. Dec. 425, decided in 1848, pending a suit for a divorce and alimony, the legislature granted a divorce at the husband's instance. After the husband's death the wife claimed dower and the wife's share of slaves and personal property, and thus brought in question the validity of the divorce act. The court declined to decide the question as to its effect upon the persons, but held it to be inoperative to divest property rights, even the inchoate right of dower.

In *Adams* v. *Palmer*, 51 Maine, 480, decided in 1863, the court held a divorce granted by the legislature of Maine in 1846, with the consent of both parties, each of whom soon afterwards contracted new marriage relations, to be valid.

In *Cabell* v. *Cabell*, 1 Met. (Ky.) 319, decided in 1858, the divorce drawn in question was granted by the legislature with the consent of both parties. Held valid.

*Maguire* v. *Maguire*, 7 Dana, 181, decided in 1838, has been often cited as a case upholding the validity of a legislative divorce, but the only point actually decided in that case was that, under the then existing laws of Kentucky, the courts had no jurisdiction of a suit by a wife for a divorce against her husband, he being at the time not a resident of the State and absent therefrom.

Although these cases are sometimes cited as upholding the doctrine that divorces in this country by special legislative acts are constitutional and valid, they do not support that doctrine, but rather bear in the opposite direction. In connection with some of these cases Judge Story has said "that marriage, though it be a civil institution, is understood to constitute a solemn obligatory contract between the parties; and it has been *arguendo* denied that a state legislature constitutionally possesses authority to dissolve that contract against the will and without the default of either party." And in a note on this passage Judge Cooley adds: "Such has been the view of state courts in general." 2. Story Const. 4th ed. § 1397.

*State* v. *Fry*, 4 Missouri, 120, decided in 1835, was a suit in the name of the State to the use of Gentry and wife against a guardian of the wife's estate. The defendant pleaded in de-

fence a special act of the legislature divorcing the plaintiffs. A demurrer to this plea was sustained by the court on the ground that the act was void. The report of the case contains the exhaustive and able arguments of counsel on both sides, showing the case to have been well presented. Able opinions were rendered by two of the justices, thoroughly discussing all the points bearing upon the validity of such acts and holding them to be void.

The case has since been followed and reaffirmed in that State by *Bryson* v. *Campbell*, 12 Missouri, 498, decided in 1849; *Bryson* v. *Bryson*, 17 Missouri, 590, decided in 1853; and by *Bryson* v. *Bryson*, 44 Missouri, 232, decided in 1869.

*Clark* v. *Clark*, 10 N. H. 380; *S. C.* 34 Am. Dec. 165, decided in 1839, is a strong decision holding that marriage is a contract indissoluble except for misconduct sufficient to work a forfeiture of rights, and that a divorce can be granted only in a regular judicial proceeding.

It is to be noted that the alleged divorce now under consideration was by an act of a territorial legislature, and there is a broad distinction, therefore, between this case and all the cases arising under legislation by States. The following is a list of the cases we have found in which the validity of a divorce granted by special act of a territorial legislature has come in question in other jurisdictions: *Ponder* v. *Graham*, 4 Florida, 23, decided in 1851; *Levins* v. *Sleator*, 2 Green (Iowa), 604, decided in 1850; *Chouteau* v. *Magennis*, 28 Missouri, 187, decided in 1859; *Estate of Higbee, deceased*, 5 West Coast Rep. 505, decided in 1885.

A majority of these cases — that is, all of them except the Iowa case — deny that a territorial legislature has the power to grant a divorce, and we invite a comparison of the opinions in these different cases. It will be found that the Iowa decision is based upon premises and assumptions which must have been avoided if more than a most careless or superficial examination of the subject had been given by the court, and the sentiments expressed are un-American throughout, while the opinions in the Florida, Missouri, and Utah cases are based upon sound and incontrovertible arguments, and express only the

most wholesome American ideas of government. It is to be noted that prior to the passage of the organic act of Oregon Territory, in 1848, no divorce granted by a territorial legislature had been upheld in any reported case.

There are many other cases containing a vast amount of *obiter dicta* for and against the validity of legislative divorces, but as the point was not necessary to be considered in the decisions rendered, they cannot be regarded in the light of authority. The American authors and commentators who have discussed the question, except Mr. Bishop, condemn the practice and deny that divorce is a rightful subject of legislation. Judge Cooley says that "the general sentiment in the legal profession is against the rightfulness of special legislative divorces." Cooley Const. Lim. 4th ed. 113. (Marginal.) That the American people generally concur with the legal profession on this subject is evidenced by the fact that most of the state constitutions expressly prohibit special legislative divorces.

In 1826 Congress annulled several special acts of divorce passed by the legislature of the Territory of Florida (4 Stat. 167, § 14), whereupon Chancellor Kent remarks : " This is an instance of a strong national condemnation of the practice of granting legislative divorces." 2 Kent Com. 405, note *a*, 4th ed. And his opinion of the action of Congress was concurred in by the Supreme Court of Florida in the case of *Ponder* v. *Graham*, 4 Florida, 44.

But even if the authorities were otherwise and practically unanimous, as the court below supposed we maintain that the practice of granting divorces by special legislative acts without the consent or fault of or notice to either party, is wrong; that all decisions to the contrary are erroneous, and that error oft repeated does not thereby become right, especially when all the time met by counter-decisions. Moreover, the question is to be determined by the law of Oregon, and not by the law of any of the States.

Although the power to grant divorces in England belongs to and has been exercised by Parliament, it does not follow that similar power belongs to the legislatures of the States;

and although the latter may have the power, it does not follow that similar power is possessed by the legislatures of any of the Territories, for, as we shall show presently, the latter have only the powers expressly delegated to them by Congress. This point is made clear in *Ponder* v. *Graham,* 4 Florida, 33. See also *Kilbourn* v. *Thompson,* 103 U. S. 183.

A divorce cannot be *rightfully* granted in any case without cause. To ascertain and declare the existence of sufficient cause in a particular case is not a legislative but a judicial function, and judicial power is not given to the legislature, but is vested in the courts by the section of the organic act above cited.

By the fourteenth section of the organic law of Oregon Territory the inhabitants thereof were granted all the rights, privileges, and advantages secured to the people of the Northwest Territory by, and subjected to all the conditions and restrictions and prohibitions of, the articles of compact contained in the ordinance of 1787. That ordinance provides that, "in the just preservation of rights and property, it is understood and declared that no law ought ever to be made or have any force in the said territory that shall in any manner interfere with or affect private contracts or engagements, *bona fide* and without fraud, previously formed." Gen. Laws, Oregon, 59.

Lydia A. Maynard, at the time of the passage of the act, was not within the Territory of Oregon, and being separated from her husband, in fact without her fault, she was not affected by his change of domicile, but remained as he left her, domiciled in Ohio. Such being the case, an act, passed without notice to her and without her consent, is void as to her. *Cheely* v. *Clayton,* 110 U. S. 701, 705; *People* v. *Baker,* 76 N. Y. 78. The supposed act of divorce, being void for want of power in the legislature, could acquire no vitality or become valid by the mere failure of Congress to disapprove and annul it. Congress had doubtless adjourned on March 3, 1853, before a copy of the laws reached Washington. Lydia did not hear of the transaction for over six months after its date, and Catharine was married to Maynard on the 15th of January, 1853.

Congress has exercised its power of annulling territorial

statutes but sparingly, and there are many reasons for this other than a deliberate intention to acquiesce. Members of Congress have neither the time nor inclination to study the different enactments of the territories or perform the amount of labor necessary to the passage of bills to annul the bad ones; and it is preferable to leave the people to legislate for themselves so long as the courts are open and free to pronounce void all such acts as are in violation of the Constitution or laws of the United States and such as the legislatures have no power to pass.

The courts have pronounced many territorial statutes void long after they have taken effect, although Congress had failed to annul them. We will cite an instance of recent occurrence: In 1883 the legislature of Washington Territory passed an act extending the elective franchise to women. Under this act women voted, were elected to and filled public offices, and served as grand and petit jurors, and judgments were rendered upon their presentments and verdicts; and afterwards, in 1887, the supreme court of Washington Territory, in the case of *Harland* v. *The Territory*, 13 Pac. Rep. 453, held this statute void for want of a good title to express its object, as required by the organic act of the Territory, although Congress had failed to annul the act. This decision was rendered by a divided court, but it has since been reaffirmed by a unanimous decision of the court as now constituted.

In *Dunphy* v. *Kleinsmith and Duer*, 11 Wall. 610, this court, in effect though not in words, held the civil practice act of Montana void, although it had been in operation in that Territory several years, and had not been disapproved by Congress.

See also *Ponder* v. *Graham* (above cited), in which case it is shown that even by an affirmative approval Congress could not make such an act valid, because Congress has no judicial power except as specified in the Constitution, and could not itself grant a divorce. This argument is conclusive on the point, and it is supported by the decision of this court in *Kilbourn* v. *Thompson*, 103 U. S. 192. This latter case also contains a perfect answer to the suggestion of the court below,

that the proceedings of the legislature in a matter affecting individual rights cannot be reëxamined in the courts at the suit of the injured party.

In conclusion, we submit that this was an act of gross injustice to a blameless woman and her children, and the judgment of the court below sustaining it ought to be reversed.

*Mr. Walter H. Smith* for appellee.

Mr. Justice Field, after stating the case, delivered the opinion of the court.

As seen by the statement of the case, two questions are presented for our consideration: first, was the act of the Legislative Assembly of the Territory of Oregon of the 22d of December, 1852, declaring the bonds of matrimony between David S. Maynard and his wife dissolved, valid and effectual to divorce the parties; and, second, if valid and effectual for that purpose, did such divorce defeat any rights of the wife to a portion of the donation claim.

The act of Congress creating the Territory of Oregon, and establishing a government for it, passed on the 14th of August, 1848, vested the legislative power and authority of the Territory in an Assembly, consisting of two boards, a Council and a House of Representatives. 9 Stat. 323, c. 177, § 4. It declared, § 6, that the legislative power of the Territory should " extend to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States," but that no law should be passed interfering with the primary disposal of the soil; that no tax should be imposed upon the property of the United States; that the property of non-residents should not be taxed higher than the property of residents; and that all the laws passed by the Assembly should be submitted to Congress, and if disapproved should be null and of no effect. It also contained various provisions against the creation of institutions for banking purposes, or with authority to put into circulation notes or bills, and against pledging the faith of the people of the Territory to any loan. These exceptions from the grant of legislative power have no bearing upon the

questions presented. The grant is made in terms similar to those used in the act of 1836, under which the Territory of Wisconsin was organized. It is stated in *Clinton* v. *Englebrecht*, 13 Wall. 434, 444, that that act seemed to have received full consideration ; and from it all subsequent acts for the organization of territories have been copied, with few and inconsiderable variations. There were in the Kansas and Nebraska acts, as there mentioned, provisions relating to slavery, and in some other acts provisions growing out of local circumstances. With these, and perhaps other exceptions not material to the questions before us, the grant of legislative power in all the acts organizing territories, since that of Wisconsin, was expressed in similar language. The power was extended " to all rightful subjects of legislation," to which was added in some of the acts, as in the act organizing the Territory of Oregon, "not inconsistent with the Constitution and laws of the United States," a condition necessarily existing in the absence of express declaration to that effect.

What were "rightful subjects of legislation" when these acts organizing the Territories were passed, is not to be settled by reference to the distinctions usually made between legislative acts and such as are judicial or administrative in their character, but by an examination of the subjects upon which legislatures had been in the practice of acting with the consent and approval of the people they represented. A long acquiescence in repeated acts of legislation on particular matters, is evidence that those matters have been generally considered by the people as properly within legislative control. Such acts are not to be set aside or treated as invalid, because upon a careful consideration of their character doubts may arise as to the competency of the legislature to pass them. Rights acquired, or obligations incurred under such legislation, are not to be impaired because of subsequent differences of opinion as to the department of government to which the acts are properly assignable. With special force does this observation apply, when the validity of acts dissolving the bonds of matrimony is assailed, the legitimacy of many children, the peace of many families, and the settlement of many estates depend-

ing upon its being sustained. It will be found from the history of legislation that, whilst a general separation has been observed between the different departments, so that no clear encroachment by one upon the province of the other has been sustained, the legislative department, when not restrained by constitutional provisions and a regard for certain fundamental rights of the citizen which are recognized in this country as the basis of all government, has acted upon everything within the range of civil government. *Loan Association* v. *Topeka,* 20 Wall. 655, 663. Every subject of interest to the community has come under its direction. It has not merely prescribed rules for future conduct, but has legalized past acts, corrected defects in proceedings, and determined the status, conditions, and relations of parties in the future.

Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution.

It is conceded that to determine the propriety of dissolving the marriage relation may involve investigations of a judicial nature which can properly be conducted by the judicial tribunals. Yet such investigations are no more than those usually made when a change of the law is designed. They do not render the enactment, which follows the information obtained, void as a judicial act because it may recite the cause of its passage. Many causes may arise, physical, moral, and intellectual — such as the contracting by one of the parties of an incurable disease like leprosy, or confirmed insanity or hopeless idiocy, or a conviction of a felony — which would render the continuance of the marriage relation intolerable to the other party and productive of no possible benefit to society. When the object of the relation has been thus defeated, and no jurisdiction is vested in the judicial tribunals to grant a divorce,

it is not perceived that any principle should prevent the legislature itself from interfering and putting an end to the relation in the interest of the parties as well as of society. If the act declaring the divorce should attempt to interfere with rights of property vested in either party, a different question would be presented.

When this country was settled, the power to grant a divorce from the bonds of matrimony was exercised by the Parliament of England. The ecclesiastical courts of that country were limited to the granting of divorces from bed and board. Naturally, the legislative assemblies of the colonies followed the example of Parliament and treated the subject as one within their province. And until a recent period legislative divorces have been granted, with few exceptions, in all the States. Says Bishop, in his Treatise on Marriage and Divorce: "The fact that at the time of the settlement of this country legislative divorces were common, competent, and valid in England, whence our jurisprudence was derived, makes them conclusively so here, except where an invalidity is directly or indirectly created by a written constitution binding the legislative power." § 664. Says Cooley, in his Treatise on Constitutional Limitations: "The granting of divorces from the bonds of matrimony was not confided to the courts in England, and from the earliest days the colonial and state legislatures in this country have assumed to possess the same power over the subject which was possessed by the Parliament, and from time to time they have passed special laws declaring a dissolution of the bonds of matrimony in special cases." p. 110. Says Kent, in his Commentaries: "During the period of our colonial government, for more than one hundred years preceding the Revolution, no divorce took place in the colony of New York, and for many years after New York became an independent state there was not any lawful mode of dissolving a marriage in the lifetime of the parties but by a special act of the legislature." 2 Kent Com. 97. The same fact is stated in numerous decisions of the highest courts of the States. Thus, in *Cronise* v. *Cronise*, 54 Penn. St. 255, 261, the Supreme Court of Pennsylvania said: "Special divorce laws

are legislative acts. This power has been exercised from the earliest period by the legislature of the province, and by that of the State, under the constitutions of 1776 and 1790. . . . The continued exercise of the power, after the adoption of the constitution of 1790, cannot be accounted for except on the ground that all men, learned and unlearned, believed it to be a legitimate exercise of the legislative power. This belief is further strengthened by the fact that no judicial decision has been made against it. *Communis error facit jus* would be sufficient to support it, but it stands upon the higher ground of contemporaneous and continued construction of the people of their own instrument."

In *Crane* v. *Meginnis*, 1 G. and J. 463, 474, the Supreme Court of Maryland said: "Divorces in this State from the earliest times have emanated from the General Assembly, and can now be viewed in no other light than as regular exertions of the legislative power."

In *Stone* v. *Pease*, 8 Conn. 541, decided in 1831, the question arose before the Supreme Court of Connecticut as to the validity of a legislative divorce under the constitution of 1818, which provided for an entire separation of the legislative and judicial departments. The court, after stating that there had been a law in force in that State on the subject of divorces, passed 130 years before, which provided for divorces on four grounds, said, speaking by Mr. Justice Daggett: "The law has remained in substance the same as it was when enacted in 1667. During all this period the legislature has interfered like the Parliament of Great Britain, and passed special acts of divorce *a vinculo matrimonii;* and at almost every session since the Constitution of the United States went into operation, now forty-two years, and for thirteen years of the existence of the constitution of Connecticut, such acts have been, in multiplied cases, passed and sanctioned by the constituted authorities of our State. We are not at liberty to inquire into the wisdom of our existing law on this subject; nor into the expediency of such frequent interference by the legislature. We can only inquire into the constitutionality of the act under consideration. The power is not prohibited either by the Con-

stitution of the United States or by that of the State.  In view of the appalling consequences of declaring the general law of the State or the repeated acts of our legislature unconstitutional and void — consequences easily conceived but not easily expressed, such as bastardizing the issue and subjecting the parties to punishment for adultery — the court should come to the result only on a solemn conviction that their oaths of office and these constitutions imperiously demand it.  Feeling myself no such conviction, I cannot pronounce the act void."  It is to be observed that the divorce in this case was granted on the petition of the wife, who alleged certain criminal intimacies of her husband with others, and the act of the legislature recited that her allegation, after hearing her and her husband, with their witnesses and counsel, was found to be true.  The inquiry appears to have been conducted with the formality of a judicial proceeding, and might undoubtedly have been properly referred to the judicial tribunals; yet the Supreme Court of the State did not regard the divorce as beyond the competency of the legislature.

The same doctrine is declared in numerous other cases, and positions similar to those taken against the validity of the act of the Legislative Assembly of the Territory, that it was beyond the competency of a legislature to dissolve the bonds of matrimony, have been held untenable.  These decisions justify the conclusion that the division of government into three departments, and the implied inhibition through that cause upon the legislative department to exercise judicial functions was neither intended nor understood to exclude legislative control over the marriage relation.  In most of the States the same legislative practice on the subject has prevailed since the adoption of their constitutions as before, which, as Mr. Bishop observes, may be regarded as a contemporaneous construction that the power thus exercised for many years was rightly exercised.  The adoption of late years in many constitutions of provisions prohibiting legislative divorces would also indicate a general conviction that without this prohibition such divorces might be granted, notwithstanding the separation of the powers of government into departments by which judicial

functions are excluded from the legislative department. There are, it is true, decisions of State courts of high character, like the Supreme Court of Massachusetts and of Missouri, holding differently; some of which were controlled by the peculiar language of their state constitutions. *Sparhawk* v. *Sparhawk,* 116 Mass. 315; *State* v. *Fry,* 4 Missouri, 120, 138. The weight of authority, however, is decidedly in favor of the position that, in the absence of direct prohibition, the power over divorces remains with the legislature. We are, therefore, justified in holding — more, we are compelled to hold, that the granting of divorces was a rightful subject of legislation according to the prevailing judicial opinion of the country, and the understanding of the profession, at the time the organic act of Oregon was passed by Congress, when either of the parties divorced was at the time a resident within the territorial jurisdiction of the legislature. If within the competency of the Legislative Assembly of the Territory, we cannot inquire into its motives in passing the act granting the divorce; its will was a sufficient reason for its action. One of the parties, the husband, was a resident within the Territory, and as he acted soon afterwards upon the dissolution and married again, we may conclude that the act was passed upon his petition. If the Assembly possessed the power to grant a divorce in any case, its jurisdiction to legislate upon his status, he being a resident of the Territory, is undoubted, unless the marriage was a contract within the prohibition of the federal Constitution against its impairment by legislation, or within the terms of the ordinance of 1787, the privileges of which were secured to the inhabitants of Oregon by their organic act, questions which we will presently consider.

The facts alleged in the bill of complaint, that no cause existed for the divorce, and that it was obtained without the knowledge of the wife, cannot affect the validity of the act. Knowledge or ignorance of parties of intended legislation does not affect its validity, if within the competency of the legislature. The facts mentioned as to the neglect of the husband to send to his wife, whom he left in Ohio, any means for her support or that of her children, in disregard of his prom-

ise, shows conduct meriting the strongest reprobation, and if the facts stated had been brought to the attention of Congress, that body might and probably would have annulled the act. Be that as it may, the loose morals and shameless conduct of the husband can have no bearing upon the question of the existence or absence of power in the Assembly to pass the act.

The organic act extends the legislative power of the Territory to all rightful subjects of legislation "not inconsistent with the Constitution and laws of the United States." The only inconsistency suggested is, that it impairs the obligation of the contract of marriage. Assuming that the prohibition of the federal Constitution against the impairment of contracts by state legislation applies equally, as would seem to be the opinion of the Supreme Court of the Territory, to legislation by territorial legislatures, we are clear that marriage is not a contract within the meaning of the prohibition. As was said by Chief Justice Marshall in the *Dartmouth College Case*, not by way of judgment, but in answer to objections urged to positions taken : "The provision of the Constitution never has been understood to embrace other contracts than those which respect property or some object of value, and confer rights which may be asserted in a court of justice. It never has been understood to restrict the general right of the legislature to legislate on the subject of divorces." 4 Wheat. 629. And in *Butler* v. *Pennsylvania*, 10 How. 402, where the question arose whether a reduction of the *per diem* compensation to certain canal commissioners below that originally provided when they took office, was an impairment of a contract with them within the constitutional prohibition, the court, holding that it was not such an impairment, said : "The contracts designed to be protected by the tenth section of the first article of that instrument are contracts by which *perfect rights, certain, definite, fixed private rights* of property are vested." p. 416.

It is also to be observed that, whilst marriage is often termed by text writers and in decisions of courts a civil contract — generally to indicate that it must be founded upon the agreement of the parties, and does not require any religious ceremony for its solemnization — it is something more

than a mere contract. The consent of the parties is of course essential to its existence, but when the contract to marry is executed by the marriage, a relation between the parties is created which they cannot change. Other contracts may be modified, restricted, or enlarged, or entirely released upon the consent of the parties. Not so with marriage. The relation once formed, the law steps in and holds the parties to various obligations and liabilities. It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress. This view is well expressed by the Supreme Court of Maine in *Adams* v. *Palmer*, 51 Maine, 481, 483. Said that court, speaking by Chief Justice Appleton:

"When the contracting parties have entered into the married state, they have not so much entered into a contract as into a new relation, the rights, duties, and obligations of which rest not upon their agreement, but upon the general law of the State, statutory or common, which defines and prescribes those rights, duties, and obligations. They are of law, not of contract. It was of contract that the relation should be established, but, being established, the power of the parties as to its extent or duration is at an end. Their rights under it are determined by the will of the sovereign, as evidenced by law. They can neither be modified nor changed by any agreement of parties. It is a relation for life, and the parties cannot terminate it at any shorter period by virtue of any contract they may make. The reciprocal rights arising from this relation, so long as it continues, are such as the law determines from time to time, and none other." And again : " It is not, then, a contract within the meaning of the clause of the Constitution which prohibits the impairing the obligation of contracts. It is, rather, a social relation, like that of parent and child, the obligations of which arise not from the consent of concurring minds, but are the creation of the law itself ; a relation the most important, as affecting the happiness of individuals, the first step from barbarism to incipient civilization, the purest tie of social life and the true

basis of human progress." pp. 484, 485. And the Chief Justice cites in support of this view the case of *Maguire* v. *Maguire*, 7 Dana, 181, 183, and *Ditson* v. *Ditson*, 4 R. I. 87, 101. In the first of these the Supreme Court of Kentucky said that marriage was more than a contract; that it was the most elementary and useful of all the social relations, was regulated and controlled by the sovereign power of the state, and could not, like mere contracts, be dissolved by the mutual consent of the contracting parties, but might be abrogated by the sovereign will whenever the public good, or justice to both parties, or either of the parties, would thereby be subserved; that being more than a contract, and depending especially upon the sovereign will, it was not embraced by the constitutional inhibition of legislative acts impairing the obligation of contracts. In the second case the Supreme Court of Rhode Island said that "*marriage*, in the sense in which it is dealt with by a decree of divorce, is not a contract, but one of the domestic *relations*. In strictness, though formed by contract, it signifies the *relation* of husband and wife, deriving both its rights and duties from a source higher than any contract of which the parties are capable, and as to these uncontrollable by any contract which they can make. When formed, this relation is no more a contract than 'fatherhood' or 'sonship' is a contract.".

In *Wade* v. *Kalbfleisch*, 58 N. Y. 282, 284, the question came before the Court of Appeals of New York whether an action for breach of promise of marriage was an action upon a contract within the meaning of certain provisions of the Revised Statutes of that State, and in disposing of the question the court said: " The general statute, 'that marriage, so far as its validity in law is concerned, shall continue in this State a civil contract, to which the consent of parties, capable in law of contracting, shall be essential is not decisive of the question.' 2 R. S. 138. This statute declares it a civil contract, as distinguished from a religious sacrament, and makes the element of consent necessary to its legal validity, but its nature, attributes, and distinguishing features it does not interfere with or attempt to define. It is declared a civil contract for certain

purposes, but it is not thereby made synonymous with the word contract employed in the common law or statutes. In this State, and at common law, it may be entered into by persons respectively of fourteen and twelve. It cannot be dissolved by the parties when consummated, nor released with or without consideration. The relation is always regulated by government. It is more than a contract. It requires certain acts of the parties to constitute marriage independent of and beyond the contract. It partakes more of the character of an institution regulated and controlled by public authority, upon principles of public policy, for the benefit of the community."

In *Noel* v. *Ewing,* 9 Indiana, 37, the question was before the Supreme Court of Indiana as to the competency of the legislature of the State to change the relative rights of husband and wife after marriage, which led to a consideration of the nature of marriage; and the court said: "Some confusion has arisen from confounding the contract to marry with the marriage relation itself. And still more is engendered by regarding husband and wife as strictly parties to a subsisting contract. At common law, marriage as a *status* had few elements of contract about it. For instance, no other contract merged the legal existence of the parties into one. Other distinctive elements will readily suggest themselves, which rob it of most of its characteristics as a contract, and leave it simply as a *status* or institution. As such, it is not so much the result of private agreement, as of public ordination. In every enlightened government, it is preëminently the basis of civil institutions, and thus an object of the deepest public concern. In this light, marriage is more than a contract. It is not a mere matter of pecuniary consideration. It is a great public institution, giving character to our whole civil polity." pp. 49–50. In accordance with these views was the judgment of Mr. Justice Story. In a note to the chapter on marriage, in his work on the Conflict of Laws, after stating that he had treated marriage as a contract in the common sense of the word, because this was the light in which it was ordinarily viewed by jurists, domestic as well as foreign, he adds: "But it appears to me to be something more than a mere contract. It is rather to be

deemed an institution of society, founded upon consent and contract of the parties, and in this view it has some peculiarities in its nature, character, operation and extent of obligation, different from what belong to ordinary contracts." § 108 n.,

The 14th section of the organic act of Oregon provides that the inhabitants of the territory shall be entitled to all the rights, privileges, and advantages granted and secured to the people of the territory of the United States northwest of the river Ohio by the articles of compact contained in the ordinance of July 13, 1787, for the government of the territory. The last clause of article two of that ordinance declares "that no law ought ever to be made or have force in said territory that shall in any manner whatever interfere with or affect private contracts or engagements *bona fide* and without fraud, previously formed." This clause, though thus enacted and made applicable to the inhabitants of Oregon, cannot be construed to operate as any greater restraint upon legislative interference with contracts than the provision of the federal Constitution. It was intended, like that provision, to forbid the passage of laws which would impair rights of property vested under private contracts or engagements, and can have no application to the marriage relation.

But it is contended that Lydia A. Maynard, the first wife of David A. Maynard, was entitled, notwithstanding the divorce, to the east half of the donation claim. The settlement, it is true, was made by her husband as a married man in order to secure the 640 acres in such case granted under the donation act. 9 Stat. 496; c. 76. But that act conferred the title of the land only upon the settler who at the time was a resident of the Territory, or should be a resident of the Territory before December 1, 1850, and who should reside upon and cultivate the land for four consecutive years. The words of the act, that "there shall be, and hereby is, granted to every white settler or occupant," is qualified by the condition of four years' residence on the land and its cultivation by him. The settler does not become a grantee until such residence and cultivation have been had, by the very terms of the act. Until then he has only a promise of a title, what is sometimes vaguely called

an inchoate interest. In some of the cases decided at the circuit, the fourth section of the act was treated as constituting a grant *in præsenti*, subject to the conditions of continued residence and cultivation, that is, a grant of a defeasible estate. *Adams* v. *Burke*, 3 Sawyer, 415, 418. But this view was not accepted by this court. In *Hall* v. *Russell*, 101 U. S. 503, the nature of the grant was elaborately considered, and it was held that the title did not vest in the settler until the conditions were fully performed. After citing the language of a previous decision, that "it is always to be borne in mind, in construing a Congressional grant, that the act by which it is made is a law as well as a conveyance, and that such effect must be given to it as will carry out the intent of Congress," the court said: "There cannot be a grant unless there is a grantee, and consequently there cannot be a present grant unless there is a present grantee. If, then, the law making the grant indicates a future grantee and not a present one, the grant will take effect in the future and not presently. In all the cases in which we have given these words the effect of an immediate and present transfer it will be found that the law has designated a grantee qualified to take according to the terms of the law, and actually in existence at the time. . . . Coming then to the present case, we find that the grantee designated was any qualified 'settler or occupant of the public lands . . . who shall have resided upon and cultivated the same for four consecutive years, and shall otherwise conform to the provisions of the act.' The grant was not to a settler only, but to a settler who had completed the four years of residence, &c., and had otherwise conformed to the act. Whenever a settler qualified himself to become a grantee he took the grant, and his right to a transfer of the legal title from the United States became vested. But until he was qualified to take, there was no actual grant of the soil. The act of Congress made the transfer only when the settler brought himself within the description of those designated as grantees. A present right to occupy and maintain possession, so as to acquire a complete title to the soil, was granted to every white person in the Territory, having the other requisite qualifica-

tions, but beyond this nothing passed until all was done that was necessary to entitle the occupant to a grant of the land." In *Vance* v. *Burbank*, 101 U. S. 514, 521, the doctrine of the previous case was reaffirmed, and the court added: " The statutory grant was to the settler, but if he was married the donation, when perfected, inured to the benefit of himself and his wife in equal parts. The wife could not be a settler. She got nothing except through her husband."

When, therefore, the act was passed divorcing the husband and wife, he had no vested interest in the land, and she could have no interest greater than his. Nothing had then been acquired by his residence and cultivation which gave him anything more than a mere possessory right ; a right to remain on the land so as to enable him to comply with the conditions upon which the title was to pass to him. After the divorce she had no such relation to him as to confer upon her any interest in the title subsequently acquired by him. A divorce ends all rights not previously vested. Interests which might vest in time, upon a continuance of the marriage relation, were gone. A wife divorced has no right of dower in his property ; a husband divorced has no right by the curtesy in her lands, unless the statute authorizing the divorce specially confers such right.

It follows that the wife was not entitled to the east half of the donation claim. To entitle her to that half she must have continued his wife during his residence and cultivation of the land. The judgment of the Supreme Court of the Territory must therefore be affirmed ; and it is so ordered.

Mr. Justice Matthews and Mr. Justice Gray dissented.

Mr. Justice Bradley was not present at the argument and took no part in the decision.