GOWIN v. GOWIN. (No. 782–4252.)

(Commission of Appeals of Texas, Section A. March 23, 1927.)

1. Marriage ⚖=1, 2—"Marriage" is a status governable by state law.

"Marriage" is a status which is governable by law of the state.

[Ed. Note.—For other definitions, see Words and Phrases First and Second Series, Marriage.]

2. Husband and wife ⚖=205(2)—Wife has no cause of action against husband for breach of marriage contract, in absence of divorce or prayer therefor.

Relief from the marriage status by divorce and adjustment of property rights being exclusive, wife has no cause of action for damages against husband as for breach of contract, in absence of divorce or prayer therefor, for failure to provide support promised prior to marriage and for humiliation and mortification.

Error to Court of Civil Appeals of Second Supreme Judicial District.

Action by Emma Lee Gowin against Jesse C. Gowin. Judgment for plaintiff was reversed and rendered by the Court of Civil Appeals (264 S. W. 529), and plaintiff brings error. Affirmed.

Ocie Speer, of Fort Worth, and Wantland, Dickey & Glasgow, of Henrietta, for plaintiff in error.

J. L. Lackey and R. E. Taylor, both of Wichita Falls, and H. M. Muse, of Henrietta, for defendant in error.

NICKELS, J. This record exhibits an inexpressibly sordid view of the marital relation, and thus gives emphasis to the importance of the principle involved.

In 1916 Jesse C. Gowin was (about) 65 years of age, "palsied and nervous." As the fruits of a former union ten children were then living, the eldest of whom was (about) 35 years of age, and three of whom (two daughters, aged 22 and ———, respectively, and a son, aged 15) resided with him in the little town of Bellevue. He was "high-tempered," and his physical condition was such that he was unable to perform manual labor except in light tasks. Emma Lee (who resided at Seymour) was the survivor of a fruitless union with Stephen C. Lee (deceased in 1914), and 42 years of age. Her father and his wife (Emma's stepmother) resided in Bellevue and were there engaged in operating a small mercantile establishment. During the Christmas holidays in 1916, Emma Lee visited her father and stepmother, and remained about three weeks. During the "three weeks" she worked in the store; coincidently, Jesse Gowin began to visit the store—was "there every day." He and Emma Lee were introduced by the stepmother, and he began to make himself useful in Emma's tasks. But he "did not specially pay his addresses" to her. Emma Lee returned to her home in Seymour, and in February, 1917, returned to Bellevue for "a few days." This was preliminary to a trip to Dallas to be made by herself and stepmother for the purpose of buying some goods for a store to be opened at Seymour. During this visit, Jesse Gowin remarked to her that "if she would listen to him, she would not have to work that way" and "he would keep her from doing any work." The

following Christmas he sent (by mail) a box of candy to her at Seymour, and she merely acknowledged receipt upon a postal card. In March, 1918, he visited her at Seymour, but what took place is not shown. The next communication between them was when he again visited her at Seymour in April, 1920, and gave her "a string of $1.25 white beads," some "cut flowers and a box of face powder and a magazine." According to Emma's testimony, "the tag was on the string of white beads, * * * and it was $1.25. * * * That is where he used bad judgment." These were all of the presents given during the "courtship." On the occasion of the visit just mentioned, Jesse proposed marriage and was accepted. The marriage followed in November, 1920. While upon the witness stand she said that she "had begun to love" him back in 1916, and that she "certainly did love him, and that is the reason" she married him, but the relevant averments of the petition upon which she seeks relief are these:

"Jesse repeatedly assured her of his devotion and love and repeatedly declared to her in substance that he was immensely wealthy, that he wanted to marry her, and that he would never permit to do any kind of menial work and would not permit her to want for anything, that he would build her the finest home in Clay county and would supply her with everything she could wish for, that he traveled a great deal and expected to take her on all his trips, and that he would provide and care for her in the best possible manner." And "all of these promises and assurances were made to her in the course of defendant's courtship and as a matter of inducement to bring about their marriage."

There is in the petition no claim that love for Jesse had anything to do with acceptance of his proposal. At the time of that acceptance, and at the time of the marriage, Emma Lee had not become acquainted with the children who resided with Jesse at Bellevue. It should be added, also, that Emma Lee had a "high temper." The enterprise, thus launched, ended "two months and six days" later. The reasons assigned in the pleading are "cruel treatment" by Jesse, plus immaterialization of the pecuniary inducements alleged.

The jury found that Jesse had offered some of the purchase price alleged and had not paid, but that he did not offer the other portions averred. "Cruel treatment" inducing the separation was found by the jury in general terms. That treatment, by the testimony, is (in substance) reduced to this: Jesse became somewhat "irritable." After retiring at night, his "toe-nails" would scratch Emma's feet and legs. Jesse said that this happened while he was asleep and, consequently, he knew nothing about it, if it happened at all, but Emma said that it was purposely done and that when she would remonstrate, and try to be "affectionate," he would do it again and also "kick" her legs. The force of the "kicks" and "scratches" is

not further shown. Emma alleged and testified that as a result of Jesse's delinquencies (i. e. his breaches of the "marriage contract") her health has been ruined, she has suffered great physical and mental pain (and will continue to do so), and that she had been damaged in the sum of $100,000. In pleading or proof no effort was made at allocating the harmful results and the damages sought as between failure of the monetary considerations and falsity of the other "inducements." The jury allowed $1,000 for "pecuniary loss sustained because of the breach of said marriage contract by the defendant" and $500 for "mental suffering * * * sustained by reason of the breach." The trial court's judgment allowed recovery of the $1,000 damages as "pecuniary loss" and denied recovery of the mental anguish quid pro quo. Divorcement was not prayed or decreed.

Upon appeal the judgment was reversed and judgment was rendered for Jesse C. Gowin by the Honorable Court of Civil Appeals, Second District. 264 S. W. 529. To this action Judge Conner dissented. Writ of error was allowed, in part, because of the "importance of the question."

At all stages of the litigation the question has been, and it now is, this: Does breach of the marital obligations by one spouse give rise to a justiciable right in the other of such nature as that the one may sue for, and recover, damages from the other as for breach of a contract, in the absence of a divorce or prayer therefor? That a comparable suit to recover damages as sounding in tort may not be maintained is to be taken as settled by the Supreme Court in Nickerson v. Nickerson, 65 Tex. 281. Counsel for Mrs. Gowin recognize this truth, but seek to avoid its analogical effect by the expressed declaration that there exists a material distinction between the two classes of cases and the implied argument that Nickerson v. Nickerson should be overruled.

Those arguments as made (and as restated in Judge Conner's dissenting opinion) embrace the ad hominem postulate that, else, there inheres in the situation a species of discrimination against women who happen to be wives, for it is said:

" * * * It is well to remember that the question is of very great importance to every woman who is, or may become, a wife or mother —a highly cherished portion of our people."
" * * * Nevertheless, with the vision in mind of the wives and mothers of men as I know them, I have resolved in their favor whatever of doubt there may be. * * *"

The assumptions are nonsequential, for the court is called upon to deal with a principle of equal application to husband and wife. If the wife has a cause of action, ex necessitate, the husband, comparably situated, has one also, and the matter is of no more "importance to every woman who is, or may become,

a wife or mother," than it is to "every man who is, or may become, a husband or father." Perforce, the "vision" is wholly imperfect and fatally lacking in silhouette in that mirage of the "husbands and fathers of women" is essential to a rounding out of the view. Else, it would be as if Belshazzar, absent a Daniel, had read encomium for execration in the letters which were written "over against the candlestick." The truth is that visions cannot inject a doubt or assist in its resolution; but if they could have anything to do with the matter in hand, they would operate equally and impartially justify resolution in favor of the "wife or mother" to the same extent as in favor of the "husband or father." Under the law, as expounded by Judge Dunklin (in the majority opinion), there is no shadow of discrimination against the woman, and, as expounded by Judge Conner, there would be no removal of discrimination, for the simple reason that none exists. On this score, it would make no difference to men or women whether Judge Dunkin's exposition or that of Judge Conner finally became the law of the land.

Except for the non sequitur mentioned, the insistence for a litigible right has for its predicate the requirements of that due process vouchsafed in the state and federal Constitutions. It is said that a "married woman" is a "person" as that term is used in the Constitutions, and an elaborate argument is made upon the point in section 430, Speer's Marital Rights, cited in the opinion of dissent. This much, of course, is granted. The asserted corollary and the conclusion are that "due process," in the constitutional sense, includes a spouse's entitlement to the remedy now claimed and by necessary imputation declares existence for the cause of action. It does so, it is claimed, because marriage is a contract and the contract (plus the right to have its terms performed) is property.

[1] But little need be said of the federal aspect, separately considered, for marriage, because it is a status and so far as anything here present is concerned is governable by state law. Maynard v. Hill, 125 U. S. 190, 8 S. Ct. 723, 31 L. Ed. 654; 6 R. C. L. p. 386.

At this late day, and especially in view of what has been said in Grigsby v. Reib, 105 Tex. 597, 153 S. W. 1124, L. R. A. 1915E, 1, Ann. Cas. 1915C, 1011, and in Maynard v. Hill, supra, and in numerous other adjudications, it may appear singular that the court is again called upon to declare whether marriage is a contract. The idea persists, we suppose, because obiter expressions to that effect may be found in opinions delivered in practically all eras of jurisprudence; its persistence, however, appears the more remarkable when it is remembered that in almost every instance (if not in every instance) the user of the expression also declared, or implied, that the relation is not like that established under or brought about through any other contract known to law or philosophy. The persistence of the idea may be due in part, also, to remembrance of times, in remote periods or characterized by what would now seem to be abnormalities, when fructification for the replenishment "of the earth" was achieved, with public approval, through purely consensual sexual relations. Examples of this are shadowed forth in scriptural precepts (see e. g. Deut. xxiv, 1, 2, and Num. xxx, 6–16) indicating the free authority of the husband to write out his own "bill of divorcement" or, unilaterally, to declare dissolution of the bonds otherwise. Other examples exist in the usages of some of the North American Indians (see Johnson v. Johnson, 30 Mo. 72, 77 Am. Dec. 598). And other abortive examples have always been current in more or less regular sexual indulgences flatulently euphemized by such designations as "free love" and "trial marriages." Whatever the cause, the thought remains to be again asserted here, and a restatement of some of the many reasons why it ought not to be countenanced is deemed proper.

Those without contractual capacity in any other respect may enter upon the estate; e. g. infants. Many of those with contractual power in all respects may not do so; for instance, a man and a man, a woman and a woman, a miscegenating pair, a brother and a sister (or those of other close kinship). Many of those without physical strength to perform the primal obligation may form the relation; e. g. an able-minded male and a like female either of whom is impotent or without the generative function. Yet who may enter, and who may not, is not determinable by presence or absence of agreement of the persons affected, but by an external influence. Mutual assent, therefore, does not create the relation; and that is true of the "common-law marriage" (as it is of the others), for to that element must be added at least apparent effort to obey the natural and scriptural law of multiplication, as, also, a species of publication. Grigsby v. Reib, supra.

When the permissible element of mutual assent has arisen and subsequently given effect (and thus executed and ended) by the marriage itself, the man and the woman, however coincident their minds and desires, may not rescind, novate, or modify, as they might do if the relation were in any just sense contractual. This is so because the thought of mankind (with a discordant view here and there) includes permanency as a necessary element of the estate. This requirement is given some pointed illustration in the contra examples already mentioned. That element, of course, so essential to the welfare of offspring and to society at large, could not be assured if the connection (or the rights and obligations pertaining thereunto, or sequent thereof) rested upon (or were as-

certainable or controllable by) agreement of the spouses.

And when the estate (whose creation, modification, or ending is not within the will of the man and the woman) is once entered, its every primary duty and obligation, of necessity, is coram non judice and beyond the compelling force of civil authority. For where is the court so wise and potent as to enforce that mutual love, respect, and benevolence which is the basic vow? What external power shall impel specific performance of the obligation to fructify, which, in deference to natural law and the prime requirement of the social state, must be presumed to have been within the contemplation of the spouses ab initio, although the presumption, on the record here, may appear somewhat mad. "As the first cause and reason of matrimony ought to be the design of having offspring, so the second ought to be the avoiding of fornication." Ayl. Parer, 360. "These two," it has been observed, "the law recognizes as its 'principal ends,' namely, 'a lawful indulgence of the passions to prevent licentiousness, and the procreation of children, according to the evident design of Divine Providence.'" 1 Bishop on Marriage, Divorce and Separation, § 760, and authorities there cited. The so-called "first cause" is the plain direction given to the first man and the first woman, as a pair, and repeated to Noah and offspring in the re-beginning. Genesis i, 28; ix, 1. The propriety of the "second" has witness in the Proverbs (v, 15), "drink waters out of thine own cistern and running waters out of thine own well," as in Paul's advice to the Corinthians (1 Cor. vii). We would replace the order of the "second cause" and give it a place somewhat lower than the one allocated to that peace which passeth all understanding which is consequent to a happy union; but be this as it may, it cannot be doubted that procreation, which requires power seminandi, and that the avoidance of licentiousness, which demands potentia copulandi, are, at once, amongst the great purposes served by the institution of matrimony and included in the vows and obligations mutually assumed by the spouses, without which, it must be presumed, the relation would not be initiated in any case. This truth notwithstanding, it may turn out, in a given case, that potentia copulandi and seminandi are nonexistent in respect to either or both of the spouses, and that, perforce, there was a mutual mistake of fact pertinent to the most important objects of the agreement. Or it may be that the physical strength exists in both persons, but a mental recalcitrance in one of them produces an equally complete failure of the objects which superinduced the relation. And yet neither party, nor both of them, may set the union at naught, as they might well do if it rested in contract. Nor is the exertion of civil authority practicable to the end either of compelling observance of the vows or giving redress' otherwise so long as the relation itself exists. If one possessed the hardihood to declare in words what is subtly implied in the contention of a contractual nature for the estate (and that is that the pecuniary incidental aspects must be taken as the primarily important subject-matter of the original agreement and that the other things are only secondarily material), his views, of course and everywhere, would meet instant repudiation, as, indeed, the private elements mentioned in respect to the Mosaic law (Deut. xxiv, 1, 2; Num. xxx, 6–16) were emphatically repealed in the later dispensation (Matt. v, 31–32; xix, 7–8, Luke xvi, 18). That cannot be a contract, in the sense of law or equity, whose primal obligations, as to performance or not, rest alone in the will, the temperament, or the physical condition, of either of the individual parties.

[2] And yet this great and requisite institution was never intended to be, and is not, a prison house for the incarceration, during life, of unfortunate spouses. The law of most jurisdictions has made the key; but that it has kept in its own control, free of user by either the man or the woman or both of them and usable only by itself when petitioned and in instances selected by itself alone. As was its right, the state has made itself a party to the arrangement independently of the will of the spouses. Having done so, and having thus esentially deprived them of the more important contractual powers, it recognizes the possibility of the tragedy of failure in any given case and its duty to grant relief to the blameless. It was not bound to provide any relief whatever, as witness the right exercised by South Carolina (Hull v. Hull, 2 Strob. Eq., 174; Mattison v. Mattison, 1 Strob. Eq., 387, 47 Am. Dec. 541; Hair v. Hair, 10 Rich. Eq., 163, 174), or it might have limited relief to instances of adultery, as has been done by many governments, or it might at any time take away the right entirely or change the conditions of its existence without impairing any contractual obligation (Maynard v. Hill, supra). The entire right to relief being thus dependent upon the sovereign will, and not existing except by grant in expressed terms, or by implications equally plain, the grant as made must be regarded as exclusive in its nature and, thus, as controlling all such matters as are involved in this case. And that grant, clearly, is of the remedy by divorcement and contemporaneous, or subsequent, adjustment of property rights—in which adjustments such things as the wife here asserts may be measurably taken into account. Such was the remedy provided for by statute, and thus held out as a part of the state's offer to become a party to the relation, when Jesse C. Gowin and Emma Lee had in mind acceptance of that offer; in assenting between themselves, they must be held to have taken it into ac-

count as the sole means of relief if their adventure should prove disastrous. Potential incompatibility, possible bickerings and backbitings, physical indignities, and failure of adequate financial support were amongst the risks which were assumed pending actual separation (which neither the law nor fact conditions prevent) or divorce. There are those who think this remedy is inadequate and who assert the view with great force. The answer, however, is that the state has judged this matter for itself, and legislative provision of a specific remedy where none would exist but for the grant is tantamount to a declaration of its sufficiency as well as of its exclusive nature.

However, that is not all. For, of course, each spouse is left responsible to the state under the criminal laws which protect all other people. And wife abandonment, under wrongful conditions, is treated as a crime.

The analogies sought to be drawn from the existence of causes of action as recognized in other classes of cases do not, in our opinion, have the support of reason. It is said that the courts, with some universality, have allowed recoveries for breach of promises to marry; but in all such cases the vital distinctions between a promise to marry and the marriage itself are recognized. Up to the point of marriage the promises are purely executory, and they become executed in toto by entry into the relation. Up to that point, also, they are intimate to the man and the woman; the state in no sense being a party. And no specific statutory remedy having been provided otherwise, the general one allowed for breach of contracts is properly available. Attention is called to Nickerson v. Nickerson, supra, and other cases, wherein recoveries as in tort were allowed the wife as against third parties. But the rights there enforced existed independent of the marital relation (and this is true of suits against third parties to recover or protect the wife's property), whereas, here, the right claimed has no source except that relation. And it is pointed out that the wife has been allowed to sue the husband for debt and to recover or protect her separate property. The causes of action, in those instances, rested upon her right of property acquired without reference to or in spite of the marital state and belonging to her in virtue of constitutional or statutory declaration. In fact there were never, in such cases, plausible grounds to challenge existence of the causes of action, but the questions presented were as to mere capacity to litigate directly instead of in an indirect and vicarious way, and the power to maintain the suits was found to inhere in the necessities of the particular condition or in statutory or constitutional provision.

A statutory provision which declares that "married women shall have power * * * to sue separately for the recovery, security, or protection of their property, and for torts committed against them, as fully and freely as if they were unmarried" (Code D. C. § 1155), would seem, by implication or analogy, to authorize a suit in tort against the husband much more clearly than any comparable enactment, or ruling, referred to by counsel for the plaintiff in error. Yet the Supreme Court, in Thompson v. Thompson, 218 U. S. 611, 31 S. Ct. 111, 54 L. Ed. 1180, 30 L. R. A. (N. S.) 1153, 21 Ann. Cas. 921, held that such a statute "was not intended to give a right of action as against the husband, but to allow the wife, in her own name, to maintain actions of tort which, at common law, must be brought in the joint names of herself and husband." Like conclusions appear to have been reached in Smith v. Gorman, 41 Me. 405, 408; Libby v. Berry, 74 Me. 286, 43 Am. Rep. 589; Keister's Adm'r v. Keister's Ex'rs, 123 Va. 157, 96 S. E. 315, 1 A. L. R. 439.

By the Mosaic law (Deut. XXII, 13–21) amercement of the husband to the extent of "an hundred shekels of silver" was allowed (in favor of the wife's father) for that species of "cruel treatment" involved in malicious and untruthful imputation of unchastity. That recovery, manifestly, was punitive and not compensatory in its nature, because it was provided for in a fixed sum and was accompanied by physical chastisement and deprivation of the right of the husband thereafter "to put her away." Some of the states have adopted statutes expressly permitting recoveries for torts committed by the husband. Johnson v. Johnson, 201 Ala. 41, 77 So. 335, 6 A. L. R. 1031; Fitzpatrick v. Owens, 124 Ark. 167, 186 S. W. 832, 187 S. W. 460, L. R. A. 1917B, 774, Ann. Cas. 1918C, 772; Brown v. Brown, 88 Conn. 42, 89 A. 889, 52 L. R. A. (N. S.) 185, Ann. Cas. 1915D, 17; Gilman v. Gilman, 78 N. H. 4, 95 A. 657, L. R. A. 1916B, 907; Crowell v. Crowell, 180 N. C. 516, 105 S. E. 206; Fiedler v. Fiedler, 42 Okl. 124, 140 P. 1022, 52 L. R. A. (N. S.) 189. Between the time of these comparatively recent enactments and the period of the Mosaic law we have found no evidence of a recovery of damages allowed to either the husband or the wife by way of compensation for breach of the marital obligations or ex delictual—at least in the absence of divorce proceedings. To us that absence, plus the fact that wherever recoveries have been permitted the courts were obeying commands of statutes, is not without meaning affirmatory of the views already expressed. If litigation of the kind now before us is to become successfully maintainable in Texas, that event must happen in response to future constitutional or statutory decree.

We recommend affirmance of the judgment of the Court of Civil Appeals.

CURETON, C. J. Judgment of the Court of Civil Appeals affirmed, as recommended by the Commission of Appeals.