**SAYLE, Estate of, In Re.**

Probate Court, Cuyahoga County.

No. 374712.   Decided November 1, 1947.

Stage, Butler & Barry, Cleveland, for exceptors.
Miller & Hornbeck, Cleveland, for administratrix.
Benesch, Friedlander & Morris, Cleveland, for Mrs. Florence
MacDonald Sayle as an individual.

## OPINION

By BREWER, J.

This matter comes before the Court on a motion to remove Florence MacDonald Sayle as administratrix of the estate of Walter C. Sayle, deceased. The motion was filed by Walter D. Sayle II and David B. Sayle, sons of Walter C. Sayle by a previous marriage. The motion to remove may not be well taken, as a motion to remove presupposes that the original appointment was valid, and would only lie in cases where the facts revealed statutory grounds for removal.

What is really sought is a vacation of the original appointment of the administratrix, for the reason that the administratrix is not the surviving spouse of the decedent, Walter C. Sayle, and therefore not entitled to preference or priority of

appointment, and the Court was without jurisdiction to appoint her. (See §10509-3 GC.)

Counsel have agreed that the sole issue is whether the administratrix is the surviving spouse of the decedent, and that the motion may be treated as one to vacate the appointment.

On the completion of the exceptors' case, the administratrix made the following motion to dismiss the motion to vacate the appointment:

"On the ground that the opposition has not sustained their burden of proof or made their case, or in the alternative, for a finding at the close of their case generally to the effect that Mrs. Sayle, the administratrix, is the widow of Chester Sayle, the decedent, on the theory, of course, that the burden of proof which is upon them, clear and convincing testimony and evidence—the burden of proof is upon them, and they have not sustained that burden."

The evidence discloses that the administratrix, before her marriage to Mr. Sayle, had married a dentist, Dr. John J. Miller, on September 28, 1922. They were estranged some time later. Finally, Dr. Miller, after filing a petition for divorce in Lorain County, went to Nevada, where on July 22nd, 1927, he filed an action for divorce against his wife, the administratrix herein. The decree was entered on November 14, 1927. Dr. Miller did not return to Cleveland for approximately eight months. Some years after his return he met his present wife and remarried. Two children were born of his second marriage. His former wife, the administratrix, who had remained in Cleveland throughout the period of Dr. Miller's absence, married Walter C. Sayle, the decedent, more than twelve years after the Nevada Court rendered the divorce decree.

This Court must determine whether the Nevada Court had jurisdiction to grant the divorce decree which dissolved the marriage of the administratrix and Dr. Miller. The decision which must be made rests solely upon the factual determination whether Dr. Miller had established a bona fide domicile in Nevada at the time he filed his petition there for a divorce.

The question presented is wholly one of fact. It is presented now, for the first time, not by any person who was a party to the Nevada divorce, nor, for that matter, to the second marriage between the administratrix and the decedent. It is presented to this Court for the first time, some twenty years after the event, by persons who were fully cognizant of the

facts, and who are interested in the proceeds of the estate of their father, the person who lived with the administratrix as her husband for five years, and who at no time raised any question as to the validity of the decree that is here placed in issue.

This Court, therefore, must, after twenty years, look into the mind of the absent party, Dr. Miller, to determine his intent respecting his residence. He could have been brought in before this Court either in person, or his deposition taken, as all counsel concede he lives in an adjoining county, but there is not one word of testimony from him. Such fragmentary and pertinent testimony as there is, must be found from two depositions which have been made a part of this record.

The deposition of Mr. Burnie L. Benbow, embodying certain employment records and letters, were read. It appears from a letter written by A. MacKenzie to D. W. Dailey, that John J. Miller was employed on April 1, 1920 by the 45th Street Properties Company; that his employment continued until March 21, 1927. On the latter date he left his place of employment, and returned on or about December 12th, 1927.

Mr. Benbow testified that Dr. Miller "walked out cold on them and he would have walked out cold on me if I had not asked to see him". He testified that Dr. Miller and the administratrix had been estranged. He also testified that Dr. Miller's sudden decision to leave the company was aggravated by embarrassments created by the return of his estranged wife, the administratrix, to employment in the same dispensary in which he worked.

He testified further that he had the following conversation with Dr. Miller relative to the doctor's intention:

"Now, he was—he didn't tell me where he was going specifically. He was leaving Cleveland and he wanted to know of me what I thought about conditions on the coast and in Arizona, and I had just been up in Oregon, and I remember making this remark to him, that it was going to be tough on a newcomer in that part of the country because they were in the doldrums. Furthermore, I told him that it was my impression that these depressions started on the Pacific Coast and went to the East Coast and went back again, and if it ever got back before another one started, why, they had a little bit of prosperity, otherwise they didn't.

"And I stated to him then that if he came back to Cleveland, I would rehire him so that he would have no loss of service.

"I don't remember, of—he did not discuss in detail any of his marital difficulties. He said he was having them. I knew things were not well because he had not been living—they had not been living together for some time. I didn't know whether it was two months or more or less."

Mr. Benbow testified that Dr. Miller sold his dental equipment to another dentist. He testified also that he never heard from Dr. Miller until Dr. Miller called him on the telephone some time in December, 1927, and that he hired him in a different branch of the company on a different payroll. Certain letters and records were offered in evidence. With the exception of the employment record, all of the letters were dated subsequent to January, 1940.

The exceptors lay stress upon the record of the re-hiring of Dr. Miller. The company records disclose that his eight-month absence was entered as a "leave of absence". It is apparent from the evidence that the entry on the company's records involved the effect of Dr. Miller's absence on his right to company pension. The testimony of Dr. Benbow is emphatic upon the point that the entry upon the company records was made at his instance to protect the pension rights of Dr. Miller. It was stated that the time Dr. Miller was away from his employment would be considered a leave of absence, as disclosed on the 4th day of April, 1944 in a letter from A. MacKenzie to D. W. Dailey, which reads in part as follows:

"Was greatly pleased to get your letter of March 31st notifying us that Continuous Service for Dr. J. J. Miller has been restored to 4/1/1920, with his absence from 3/1/27 to 12/12/27 deducted. Under this ruling we therefore assumed that the Continuous Service date for Dr. Miller will be moved up to 1/12/1921. * * *".

Mr. Benbow testified that at the time Dr. Miller left, he did not request a leave of absence. The rules and regulations of the company, in effect at the time Dr. Miller left, provided, in part, that "application for leave of absence for more than three months shall in every case be submitted in advance to D. W. Dailey, Auditor, Nela Park, Cleveland, Ohio, for such action as may be necessary to secure approval."

It will be noted that none of the communications offered in evidence were sent or received by Dr. Miller.

At the conclusion of his testimony, Mr. Benbow testified as follows, relative to making an entry on the records of the company regarding a leave of absence and transfer:

"A  I discussed it with Kaestle but what's-his-name was not there to make application for a leave. That is the physical side of it, see? I do not remember this as—I agreed with Miller to take him back on my payroll.

Q  Yes. You had agreed?

A  Yes, I agreed.

Q  But that wasn't Miller who had agreed?

A  No.

Q  You had?

A  Well, I offered it to him.

Q  Yes. And that was your idea?

A  Yes, my idea.

Q  Exclusively?

A  That's right."

The deposition of Dr. Philip S. Osgood was read. This deposition discloses that Dr. Miller used Dr. Osgood's office in the evenings; that he discussed with Dr. Osgood his intention of going West. He further testified that he just wanted to forget Ohio; he wanted to go some place beside Cleveland. He was asked the following questions:

"Q  What disposition did he make of that equipment before he left for the west?

A  What agreement we had was to the effect that I would take it off his hands and if he decided to start practice somewhere out West I would send him a check for whatever he figured it was worth. I was going to leave it to him as to how much he wanted, and he could get new supplies and better wherever he was. * * *"

Q  Do you know why he returned from the West, of your own knowledge?

A  As I recall it, it was sickness in his parents' family, something of a serious nature, serious enough for that. I don't recall the nature of the illness."

The administratrix was called to testify. However, nothing in her testimony bears directly on the Nevada divorce.

Considering the situation preceding the Nevada divorce, the Court concludes from the evidence that Dr. Miller was having domestic difficulties, and had filed a petition for divorce in Lorain County, but left Ohio, intending to go elswhere to get a divorce, dismissed the proceedings in Lorain County, and later procured a decree in Nevada.

There is but one question in this case. It is identical with that raised in the case of **Smerda v Smerda,** 35 O. O. 472, wherein the Court said,

"The decisive question here to be determined is whether Smerda has acquired a bona fide domicile in Nevada at the time he obtained his decree of divorce in that state."

It is a well established principle of law that the mere fact that one leaves his domiciliary state and goes to another for the express purpose of procuring a divorce is not, in and of itself, grounds for another court to refuse to recognize the foreign divorce decree, so long as the person intended to make the foreign state his residence or domicile. The words "residence" and "domicile" are often used synonymously.

As stated by Kennan in his Works on "Residence and Domicile", page 457, paragraph 245:

"The mere fact that one has admittedly removed to another state for the express purpose of availing himself of the more liberal divorce laws of that state does not in itself furnish grounds for setting aside the decree subsequently obtained, if all the facts and circumstances indicate that there has been a bona fide change of domicile accompanied by the requisite intention of remaining permanently in the new location. As was said in a Connecticut case, 'The sole conditions are: (1) An actual change of residence, and (2) the absence of an intention to remove elsewhere. "But if the animus really exists to remain there permanently, the fact that the motive of removal is to procure a divorce is immaterial." There is no rule of law which prevents one from changing his domicile in order to facilitate his obtaining a divorce or to secure other advantages he may think that the laws of the new domicile may afford him. He is free to change at his pleasure, but the change must be a bona fide one to be effective.'

"On the other hand, if all the circumstances indicate that the applicant for divorce went to another state for the express purpose of securing a decree and NOT with the intention of remaining permanently, the jurisdiction of the court may be questioned . . . ."

And, in American Jurisprudence, Vol. 17, par. 261, page 286:

"If the animus to remain permanently in the place to which a person removes really and in good faith exists, the

motive affecting his removal, as that he goes there for the purpose of availing himself of divorce laws more favorable to him, is immaterial. There is no rule of law which prevents one from changing his domicil in order to facilitate his obtaining a divorce or his securing other advantages he may think that the laws of the new domicil may afford him. He is free to change at his pleasure, but the change must be a bona fide one to be effective. If actual and bona fide, the change will be accomplished."

The exceptors must bear the burden of proof to show that Dr. Miller did not intend to remain in Nevada, or, as stated in Williams v North Carolina, 325 U. S. page 226, at page 233, reiterated in the Smerda case,

"The burden of undermining the verity which the Nevada decrees import rests heavily on the assailant",

and the Supreme Court, on page 234:

"* * * that the burden of overcoming such respect by disproof of the substratum of fact—here domicil—on which such power alone can rest was properly charged against the party challenging the legitimacy of the judgment. * * *"

and again on page 236:

"Appropriate weight was given to the finding of domicil in the Nevada decrees and that finding was allowed to be overturned only by relevant standards of proof."

Exceptors to sustain their motion rely upon the Williams and Smerda cases.

It is the facts in each particular case that control the conclusion which the Court must reach in applying the rule of the Williams and Smerda cases. A comparison of these facts distinguishes and contrasts them. It makes the findings in those cases wholly inapplicable to the case at bar.

In the Williams case, Hendrix married Lillie Shaver at Icard, North Carolina, in 1920. He and his wife made their home in Caldwell County and likewise lived there together until May 7, 1940. On that date Mrs. Hendrix and Mr. Williams disappeared from their respective homes. The record does not show whether they journeyed westward together, but we are told that on May 15, 1940, Williams and his employee's wife, Mrs. Hendrix, "established a residence" at the Alamo Court,

Las Vegas, Nevada. Exactly six weeks after their arrival in Nevada each filed a petition for divorce in that state. The same counsel represented them and each charged "extreme cruelty" as the ground for divorce. The divorce actions proceeded as uncontested, and on August 26, 1940, a decree of absolute divorce was granted by the Nevada Court to Mr. Williams. Mrs. Hendrix obtained her decree of absolute divorce on October 4, 1940, and on the same day she and Williams were married in Nevada. Almost immediately after their marriage, Williams and his new "bride" made the journey back, established their home in Pineola, Avery County, North Carolina, and lived together as man and wife. These were the facts which led to an indictment for bigamous cohabitation against both Mr. Williams and Mrs. Hendrix under Section 4342 of the 1939 North Carolina Code.

In the Smerda case, supra, the defendant in January, 1942, left by automobile with his mother and a woman whom he subsequently married, for Tucson, Arizona. After spending eight days in Tucson he drove to Carson City, Nevada, and after one night at Carson City, he went to Reno, Nevada. Immediately upon the expiration of six weeks in Reno, Nevada, Mr. Smerda filed a suit for divorce against his wife. On the 18th day of April, 1942, he obtained a decree of divorce. On the 20th day of April, 1942, he left Reno and went to San Francisco where he spent one day, then went to Tucson, and the day following his arrival took his mother and the future Mrs. Smerda back to Cleveland with him. A few weeks thereafter he went to Covington, Kentucky, with the woman who accompanied him, and was married. Shortly after his return to Cleveland with his wife, the first Mrs. Smerda, learning of the marriage, instituted the action. The following is an excerpt from the Court's opinion, on page 475:

". . . . At the time of his departure from Cleveland early in 1942 Smerda was a member of three lodges in this city and also a member of the Edgewater Yacht Club and the owner of a twenty-four foot power boat. He had a small ·savings account at one of the local banks which remained unchanged during his absence from the city. Immediately preceding his departure for Arizona, Smerda opened a commercial checking account with The Cleveland Trust Company. He signed a book of blank checks and gave it to one of the clerks in his store. He claims that no instructions were given to the clerk but it appears that at regular intervals during his absence, checks covering the weekly installments of alimony and support were delivered to the plaintiff. Regular deposits were

made in this commercial account from disbursements by Smerda's Music House, Inc., to the credit of Frank Smerda.

"When he left for Arizona, Smerda took but one traveling bag of clothing and personal effects with him. He testified that at that time he had no definite plan in respect of his return nor had he determined whether he would establish a home elsewhere. He stated that during his brief stay in Arizona with his mother and Mrs. Boresch he learned from an unidentified person in Tucson that Reno, Nevada, offered attractive prospects for the sale of electrical appliances; that because of his experience in Cleveland in that business he decided to go to Reno to explore the possibilities of engaging in business there. He asserts that upon leaving Tucson for Nevada he had no intention of obtaining a divorce . . . ."

Residence or domicile arises from a state of mind with respect to a place as well as from the physical connection with it. Judge Rutledge, in his dissenting opinion in the Williams case, says:

". . . . But, beyond this, 'home' in the domiciliary sense can be changed in the twinkling of an eye, the time it takes a man to make up his mind to remain where he is when he is away from home. He need do no more than decide, by a flash of thought, to stay 'either permanently or for an indefinite or unlimited length of time' ".

As bearing on Dr. Miller's intent, certainly nothing in the evidence presented by the exceptors could be considered as "undermining the verity which the Nevada decrees import". If this Court had the benefit of the testimony of Dr. Miller, it would be easier to determine whether his actions were supported by his words. As Judge McNamee said about Mr. Smerda, "his statement that he intended to remain in Nevada does not square with his conduct."

Certainly, by no stretch of the imagination, is there similarity between the case at bar and the Williams and Smerda cases. In both of those cases the persons who subsequently married, left together for Nevada, and in both cases their return to their domiciliary state followed soon after the divorces, and they were shortly married.

Dr. Miller, so far as the record discloses, was unaccompanied and did not marry until years later.

In the Williams and Smerda cases the parties took little of their personal belongings or assets with them when they

went to Nevada. Dr. Miller left Ohio, and as Mr. Benbow testified, "he was clearing out".

In the Williams and Smerda cases the actions challenging the validity were filed shortly after the decrees of divorce were granted. In the instant case action was not commenced until twenty years later.

In the Williams case, a criminal prosecution, not involving the property rights of individuals, the jury decided that it was not the parties' intention to remain residents of Nevada.

In the Smerda case, the Court determined from all the testimony that it was not the intention of Smerda to remain in Nevada.

In the insant case, there is no evidence whatsoever that Dr. Miller did not intend to remain in Nevada.

This Court feels impelled, as was Mr. Justice Black, in his dissenting opinion in the Williams case, supra, "to protest as vigorously as I can" against the decision in the Williams case, and hence, to that in the Smerda case. It is not to the finding on the specific sets of facts in each of these cases that this Court disagrees (because as has so often been said, bad facts make for bad law), but to the application of the announced principle of law relative to foreign divorces generally.

Neither the Williams nor the Smerda cases make any exceptions as to time, estoppel, or take into consideration the persons involved, or the ultimate effects of the findings. To follow these holdings blindly would be to place untold thousands in the position of bigamists, mistresses and illegitimates, or, as stated by Mr. Justice Black in his dissent in the Williams case, page 262:

"Even more the court's opinion today will cast a cloud over the lives of countless numbers of the' multitudes of divorced persons in the United States,"

or, putting it in the layman's language, to carry it to perhaps an improbable situation, as Frank Sullivan in the St. Louis Star Times of June 1, 1945, wrote:

"Hundreds of thousands of citizens who now think they are married may find that they are unmarried, and unmarried not once, but maybe four or five times, depending on how often they have been divorced. We may find ourselves a nation of bigamists, or trigamists, or in Hollywood and New York, even quadrigamists and quinquigamists.

"Suppose California follows North Carolina and decides that the last four divorces of Miss Carmencita Passion, the

screen star, have not been valid because her few weeks at Reno did not amount to a legal domicile. To keep out of jail, Miss Passion must do one of two things. Either she must throw a few husbands into a bag and quickly get over to Nevada, where all her divorces still are legal, and stay there; or she must get back pronto to her first and seemingly only husband.

"But her husband cannot take her back because he at present is married to the third wife of her fourth husband. The fourth husband cannot take his third wife off the hands of Carmencita's first husband because he is married for the nonce to the second wife of her fifth husband.

"Everybody in Hollywood will be in some such fix as this. Why, finding your correct husband or wife may be a worse chore than making out your income tax."

Let us consider the results that might flow from holding against the administratrix in the case before us. Mr. Sayle died on the 15th day of September, 1945, intestate. The decedent left an estate of more than a millon dollars. Under the laws of intestate succession, the widow, aside from certain statutory rights, will be entitled to one-third of the estate. Each of the exceptors will get a third. The administratrix and decedent entered into a ceremonial marriage in good faith some five years prior to his death. Mr. Sayle's voice is stilled and he can not protest the action now being taken by his sons.

Here in question is a divorce granted in 1927, twenty years ago. Fourteen years later the administratrix married Mr. Sayle. Dr. Miller remarried some years after the divorce, and now has two children by his second marraige. If the exceptors were successful as the result of this action in invalidating this ancient divorce decree, the reward they would get could only be measured in dollars. The havoc they would leave in terms of social relations would be regrettable. The stigma of mistress would be upon Mrs. Sayle, not the honorable title of wife. The present Mrs. Miller, an innocent party in every sense of the word, would find herself unmarried. Her two children would be bastards.

If following the Williams and Smerda cases, would from the evidence presented, require this Court to hold the marriage a nullity in this State, then the cloak of office would be too heavy for this Court to wear and some other judge would have to dispense this "justice".

A humorous and hypothetical situation, but not too far removed from the instant case, with the exception that there is not one scintilla of evidence that Dr. Miller knew his present

wife at the ·time of his divorce, can be found· in Volume 14,. Kansas Bar Journal, page 12, which reads in part as follows:

". . . . Now, suppose that Mary marries John in Oklahoma,. children are born to them and they live there for some years. John meets Marie, who lives back of the field, and a short time later John develops a longing for Marie. John moves to Kansas for the sole purpose of establishing a residence in the State of Kansas, and obtaining a divorce decree from Mary. He stayed a whole year in Kansas. before he filed his divorce suit. The case is heard in the Kansas Court and testimony is offered that he has been an actual bona fide resident of the State of Kansas for more than one year. The court doesn't know anything about the secret intentions of John, and grants a decree of divorce. Then John marries Marie in Kansas and immediately moves back to Oklahoma. A short time thereafter a child is born and in a few months John dies, so Mary has. children and Marie a child fathered by John. John was the owner of a good farm, and immediately a fight starts as to who owns the farm. Mary says that John went to Kansas. for the sole purpose of obtaining a divorce and marrying Marie; that was John's secret intention and the Kansas Court could not find that it had jurisdiction and wrap itself up in such findings and prohibit the Oklahoma Court from inquiring into the jurisdiction of the Kansas Court.

"The nice and delicate question is submitted to an Oklahoma. jury as to whether John went to Kansas for the sole purpose of establishing a domicile or residence to the end ʻthat he might obtain a divorce. The jury in all probability will find. that Mary is the legal widow of John; that her children are legitimate and Marie's child is a bastard in Oklahoma. Marie's child would not be a bastard in Kansas, so WHEN AND WHERE IS A MAN A BASTARD? . . . ."

The decision in the Williams case, supra, has aroused comment not only from the bar, but from the laymen. No at-- torney is now able to properly advise a client as to the result. of a foreign divorce, but the attorneys and laymen are not. alone in their dilemma, if the article in the Daily Legal News· reflects properly the confusion of the United State Supreme· Court. Under date of October 15, 1947, there appears this. headline, "Supreme Court Justices Agree Divorce Laws Com-- pletely Confused Now". This uncertainty is well expressed by Mr. Justice Rutledge in his dissent in the Williams case, in. which he states, on page 244:

". . . . Once again the ghost of 'unitary domicile' returns on its perpetual round, in the guise of 'jurisdictional fact,' to upset judgments, marriages, divorces, undermine the relations founded upon them, and make this court the unwilling and uncertain arbiter between the concededly valid laws and decrees of sister states. From Bell and Andrews to David to Haddock to Williams, and now through Williams again—is the maze the Court has traveled in a domiciliary wilderness, only to come out with no settled constitutional policy where one is needed most . . . ."

Although the Bell case, 181 U. S. 175, was decided in 1901, the Supreme Court, it would appear, was more conservative prior to that time, for in 1869 the Supreme Court held that a divorce decree rendered by a court at the domicile of one of the parties, after personal service within the state upon the other spouse, is entitled to full faith and credit. (Cheever v Wilson, 76 U. S. (9 Wall.) 180 (1869).) Later the Court held that a divorce granted by the territory of Oregon to a domiciliary, who had deserted his wife in Ohio, was valid within the Oregon territory. (Maynard v Hill, 125 U. S. 190 (1887).) In 1901 it was decided that a divorce granted either spouse at the matrimonial domicile, even if there was no personal service on the defendant within the state and no appearance, was entitled to full faith and credit in other states. (Atherton v Atherton, 181 U. S. 155 (1901); Thompson v Thompson, 226 U. S. 551 (1903).)

This Court recognizes the general rule of law that the full faith and credit rule is only applicable where the foreign court rendering the judgment has jurisdiction, but the time is not yet here when the full faith and credit rule has sunk to no faith and discredit.

This Court does not condone "quickie" divorces where persons seek to cast aside spouses and liabilities with complete abandonment, nor suggests that in no case the question of intent be not questioned. However, neither is this Court willing to subscribe to a rule that every foreign divorce be open to examination by all persons without regard to time, equities, estoppel, or remote interest. There must be a middle road. The history of our law discloses that where situations appear hopeless a solution is always found.

Were it within the province of any court to lay down rules that would protect the property rights and the social existence of literally millions of persons who live today under a state of doubt and possible insecurity, in view of the law as it has been announced, it would be urged that:

First: No action to set aside a divorce decree of a sister state shall be maintained except by the parties to the original marriage. This would prevent the state, or any person other than the party to the original marriage, from seeking to avoid the divorce.

Second: That any action to set aside the divorce decree of a sister state must be filed within one year after actual knowledge of the divorce is received by the spouse.

Third: No action to set aside a divorce of a sister state shall be entertained where the avoidance of the decree will affect the legitimacy of children. It is the policy of the courts to declare offsprings legitimate rather than illegitimate.

Fourth: No action to set aside a foreign divorce shall be entertained where the defendant has subsequently remarried. The reason is self-evident that no one should be permitted to act upon the faith of a foreign divorce decree, and later be permitted to challenge it.

In view of the testimony and mindful of the decisions in the case of **Smerda v Smerda, CP 48 Abs 232** and Williams v North Carolina, upon which the exceptors rely, this Court can come to but on conclusion, that the exceptors have not sustained "the burden of undermining the verity which the Nevada decrees import".

The Court, therefore, grants the motion of the administratrix to dismiss the motion of the exceptors.