KELLY, J.
(dissenting). The issue we decide is whether the so-called “marriage amendment”[1] of the Michigan Constitution prevents public employers from voluntarily providing health benefits to their employees’ same-sex domestic partners. The majority has determined that it does. I disagree.
First, the language of the amendment itself prohibits nothing more than the recognition of same-sex marriages or similar unions. It is a perversion of the amendment’s language to conclude that, by voluntarily offering the benefits at issue, a public employer recognizes a union similar to marriage. Second, the circumstances surrounding the adoption of the amendment strongly suggest that Michigan voters did not intend to prohibit public employers from offering health-care benefits to their employees’ same-sex partners. The majority decision does not represent “the law which the people have made, [but rather] some other law which the words of the constitution may possibly be made to express.”[2] Accordingly, I dissent.
*88 THE UNDERLYING FACTS
On November 2, 2004, a majority of Michigan voters chose to amend the Michigan Constitution to add § 25 to article l.[3] This amendment is sometimes termed the “marriage amendment.” It provides:
To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.
At the time the amendment was adopted, several public employers in the state had policies that extended health-care benefits to their employees’ same-sex domestic partners. Also, the Office of the State Employer had negotiated an agreement that was to provide domestic-partner benefits to some state employees.[4]
In March 2005, in response to an inquiry, the Attorney General issued a formal opinion that concluded that the amendment prohibited public employers from granting benefits to their employees’ same-sex partners.[5] Five days after the Attorney General issued the opinion, National Pride At Work, Inc., which is a constituency group of the AFL-CIO, and 41 individuals[6] filed the instant lawsuit against Governor Granholm. The lawsuit sought a declaratory judgment that the *89 amendment does not prohibit public employers from providing the benefits.[7]
The Attorney General, acting on the Governor’s behalf, moved to dismiss the suit on the basis that plaintiffs lacked standing. The Governor then obtained separate counsel and withdrew the motion. She proceeded to file a brief supporting plaintiffs’ position. This prompted the Attorney General to intervene as a defendant.
Plaintiffs moved for summary disposition, arguing that the amendment does not prohibit public employers from voluntarily providing the benefits at issue. The trial court agreed and granted the motion. The court found that the amendment does not prohibit the benefits because “[b]y voluntarily providing domestic partner health care benefits to an employer-defined group of people, the Plaintiffs’ employers are not ‘recognizing a marriage or similar union.’ ”[8]
The Attorney General appealed the trial court’s decision in the Court of Appeals and moved for a stay. The Court of Appeals granted the stay and, in a unanimous published opinion, reversed the trial court’s decision. The panel concluded that the amendment prohibited public employers from granting health benefits to their employees’ same-sex domestic partners.[9]
*90 This Court granted leave to appeal to consider the issue.[10]
TWO KEY CONSIDERATIONS
As always, when interpreting the Michigan Constitution, this Court’s “duty is to enforce the law which the people have made, and not some other law which the words of the constitution may possibly be made to express.”[11] The initial step in determining what law the people have made is to examine the specific language used. In so doing, “ ‘ “it is not to be supposed that [the people] have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.” ’ ”[12] And, since our task is a search for intent, it is often necessary to “consider the circumstances surrounding the adoption of the provision and the purpose it is designed to accomplish.”[13]
THE CIRCUMSTANCES SURROUNDING THE ADOPTION OF THE AMENDMENT
Beginning in 1993 with the Hawaii Supreme Court case of Baehr v Lewin,[14] a number of state courts and state legislatures joined in a national discussion on the constitutionality of barring same-sex marriages. In Baehr, the court held that Hawaii’s statute limiting *91 marriage to one man and one woman was presumptively unconstitutional under the Hawaii Constitution. It held that the state had the burden of showing a compelling state interest in Hmiting marriage to male/female unions.[15] Following Baehr, the Vermont Supreme Court issued a decision in 1999 ordering the state legislature to create a legal form that would afford same-sex couples a status similar to that of married couples.[16] Then, in 2003, in the famous case of Goodridge v Dep’t of Pub Health,[17] the Massachusetts Supreme Judicial Court held that barring two people of the same sex from marrying violated the equal protection guarantees of the Massachusetts Constitution.[18] That same year, the California Legislature granted registered domestic partners “the same rights, protections, and benefits ... as are granted to and imposed upon spouses.”[19]
It was against this background that the Michigan Christian Citizens Alliance commenced an initiative to amend the Michigan Constitution to bar same-sex marriage. The alliance formed the Citizens for the Protection of Marriage committee (CPM) “in response to the debate taking place across the country over the definition of marriage.”[20] The committee’s stated goal was to place the issue of same-sex marriage on the ballot so that Michigan voters would have the ultimate say in the matter.[21]
*92 During CPM’s campaign, concerns arose regarding exactly what the amendment would prohibit. CPM attempted to address these concerns at an August 2004 public certification hearing before the Board of State Canvassers.[22] Specifically, CPM addressed whether the amendment, which it had petitioned to place on the ballot, would bar public employers from providing benefits to their employees’ same-sex domestic partners. CPM’s representative, attorney Eric E. Doster, assured the board that it would not. Mr. Doster stated:
[T]here would certainly be nothing to preclude [a] public employer from extending [health-care] benefits, if they so chose, as a matter of contract between employer and employee, to say domestic dependent benefits ... [to any] person, and it could be your cat. So they certainly could extend it as a matter of contract.
[A]n employer, as a matter of contract between employer and employee, can offer benefits to whomever the employer wants to. And if it wants to be my spouse, if it wants to be my domestic partner — however that’s defined under the terms of your contract or my cat, the employer can do that... .[23]
Mr. Doster reiterated this point several times throughout the proceedings.
I’d hate to be repetitive, but again, that’s a matter of contract between an employer and employee. And if the employer wanted to do that, offer those benefits, I don’t see how this language affects that. If the language just said “marriage” or “spouse,” then I would agree with you. But *93 there’s nothing in this language that I would interpret that would say that that somehow would go beyond that.[24]
In its campaign to win over voters, CPM made a number of additional public statements that were consistent with Mr. Doster’s testimony before the Board of State Canvassers. For example, Marlene Elwell, the campaign director for CPM, was quoted in USA Today as stating that “[t]his has nothing to do with taking benefits away. This is about marriage between a man and a woman.”[25] Similarly, CPM communications director Kristina Hemphill was quoted as stating that “[t]his Amendment has nothing to do with benefits.... It’s just a diversion from the real issue.”[26]
CPM also made clear on its webpage that it was “not against anyone, [CPM is] for defining marriage as the union of one man and one woman. Period.”[27] Instead, CPM contended that its reason for proposing the amendment was its belief that “[n]o one has the right to redefine marriage, to change it for everyone else. Proposal 2 will keep things as they are and as they’ve been. And by amending Michigan’s constitution, we can settle this question once and for all.”[28]
CPM even distributed a brochure that asserted that the amendment would not affect any employer health-benefit plan already in place. The brochure stated:
Proposal 2 is Only about Marriage
*94 Marriage is a union between a husband and wife. Proposal 2 will keep it that way. This is not about rights or benefits or how people choose to live their life. This has to do with family, children and the way people are. It merely settles the question once and for all what marriage is — for families today and future generations.[29]
It can be assumed that the clarifications offered by CPM, the organization that successfully petitioned to place the proposal on the ballot, carried considerable weight with the public. Its statements certainly encouraged voters who did not favor a wide-ranging ban to vote for what they were promised was a very specific ban on same-sex marriage.
And a poll conducted shortly before the election indicates that CPM’s public position was in line with public opinion. The poll results indicated that, whereas the public was in favor of banning same-sex marriage, it was not opposed to employer programs granting benefits to same-sex domestic partners.
In an August 2004 poll of 705 likely voters,[30] 50 percent of respondents favored the amendment while only 41 percent planned to vote against it. But 70 percent specifically disapproved of making domestic partnerships and civil unions illegal.[31] Sixty-five percent disapproved of barring cities and counties from providing domestic-partner benefits.[32] And 63 percent *95 disapproved of prohibiting state universities from offering domestic-partner benefits.[33]
Accordingly, the circumstances surrounding the adoption of the amendment indicate that the lead proponents of the amendment worked hard to convince voters to adopt it.[34] CPM told voters that the “marriage amendment” would bar same-sex marriage but would not prohibit public employers from providing the ben *96 efits at issue. It is reasonable to conclude that these statements led the ratifiers to understand that the amendment’s purpose was limited to preserving the traditional definition of marriage.[35] And it seems that a majority of likely voters favored an amendment that would bar same-sex marriage but would go no further. Therefore, this Court’s majority errs by holding that the amendment not only bars same-sex marriage but also prohibits the benefits at issue. The error of the majority decision is confirmed by examining the amendment’s language.
THE LANGUAGE OF THE “MARRIAGE AMENDMENT”
The “marriage amendment” provides:
*97 To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.[36]
It has two parts. The first lists the amendment’s purpose: “[t]o secure and preserve the benefits of marriage for our society and for future generations of children ....” The second discusses how that purpose is to be accomplished. Both are relevant in determining whether public employers are prohibited from providing the benefits at issue in this case.
The “marriage amendment” undertakes to accomplish its purpose of protecting the benefits of marriage by providing that “the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.” Through this language, the amendment prohibits the recognition of same-sex “[1] marriage or [2] similar union[s].”
It is clear that the employee-benefit programs at issue do not recognize same-sex marriage. Therefore, if the programs violate the amendment, it must be by recognizing a union similar to marriage. For a union to be “similar” to marriage, it must share the same basic characteristics or qualities of a marriage.[37] Thus, in deciding whether the public employers violate the amendment by providing the benefits at issue, we must first consider what a marriage entails.
Marriage has been called “the most important relation in life .. . .”[38] It “is a coming together for better or *98 for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects.”[39]
“[B]ut [marriage] is not a pure private contract. It is affected with a public interest and by a public policy.”[40] Therefore, the state retains control to define and regulate the marriage union. It does so by defining who is qualified to marry,[41] what must be done for a marriage to take place,[42] and the methods for the solemnification and dissolution of marriage.[43]
And the state confers many rights, benefits, and responsibilities solely as the result of a marriage. As the United States Supreme Court has said, “[t]he relation once formed, the law steps in and holds the parties to various obligations and liabilities.”[44] It would take pages to list each of the state statutes that name legal rights and responsibilities that stem from a marriage. Examples of a few are: Each spouse has an equal right to property acquired during the marriage.[45] Each spouse has the right to pension and retirement benefits accrued during the marriage.[46] Each spouse has the right to invoke spousal immunity to prevent the other spouse’s testimony.[47] And each has the right to damages *99 for the wrongful death of his or her spouse.[48] In addition, there are more than 1,000 federal laws conferring even more benefits and privileges on married couples.[49]
Accordingly, it is obvious that there are two separate elements to marriage: There is the private bond between two people, which the state recognizes by solemnifying the marriage. And there are the benefits, rights, and responsibilities that the state confers on individuals solely by virtue of their status of being married. Both elements are necessary and important components of marriage. Hence, for a union to be similar to marriage, it must mirror more than the manner in which the private bond is recognized. It must also carry with it comparable benefits, rights, and responsibilities.[50]
*100 The employer benefit programs at issue do not grant same-sex couples the rights, responsibilities, or benefits of marriage. The most that can be said is that the programs provide health-insurance coverage to same-sex partners. But health coverage is not a benefit of marriage. Although many benefits are conferred on the basis of the status of being married, health benefits are not among them. Notably absent is any state or federal law granting health benefits to married couples. Instead, the health coverage at issue is a benefit of employment. And the fact that the coverage is conferred on the employee’s significant other does not transform it into a benefit of marriage; the coverage is also conferred on other dependents, such as children.
But even if health coverage were a benefit of marriage, it is the only benefit afforded to the same-sex couples in this case. The same-sex couples are not granted any of the other rights, responsibilities, or benefits of marriage. It is an odd notion to find that a union that shares only one of the hundreds of benefits that a marriage provides is a union similar to marriage. It follows that the amendment is not violated because the employee-benefit programs do not constitute recognition of same-sex “marriage or [a] similar union.”[51]
Determining that the amendment does not prohibit public employers from providing health benefits to same-sex domestic partners is consistent with the pur *101 pose explicitly expressed in the amendment. The amendment’s stated purpose is “[t]o secure and preserve the benefits of marriage for our society and for future generations of children[.]” As discussed earlier, the state is not required to provide health benefits to spouses. Therefore, it makes no sense to find that health benefits are benefits of marriage just because some public employers voluntarily provide those benefits to spouses. Instead, the health benefits at issue are benefits of employment. The amendment’s stated purpose does not protect or restrict employment benefits. Therefore, barring public employers from providing the benefits at issue does nothing to further the purpose of the amendment. This is another fact that weighs in favor of my interpretation.
The Attorney General makes much of the fact that the amendment uses the phrase “for any purpose.” The Attorney General contends that, as long as one benefit is provided to same-sex couples in the same way that it is provided to married couples, the amendment is violated. The majority accepts this argument. The majority’s interpretation of the amendment is problematic because it essentially reads the word “similar” out of the amendment. It construes the amendment to read: “the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or union for any purpose.”
The amendment does not prohibit the state from recognizing the validity of same-sex unions for any purpose. It prohibits the state from recognizing a same-sex marriage or a same-sex union that is similar to a marriage for any purpose. Accordingly, unless the state recognizes a same-sex marriage or a same-sex union that is similar to a marriage, the “for any 'purpose” language has no application. The majority fails to recognize this point.
*102 conclusion
The majority decides that the “marriage amendment” prevents public employers from voluntarily entering into contractual agreements to provide health benefits to their employees’ same-sex domestic partners. Its decision is contrary to the people’s intent as demonstrated by the circumstances surrounding the adoption of the amendment and as expressed in the amendment’s language. For those reasons, I must dissent.
Furthermore, by proceeding as it does, the majority condones and even encourages the use of misleading tactics in ballot campaigns by ignoring the extrinsic evidence available to it. CPM petitioned to place the “marriage amendment” on the ballot, telling the public that the amendment would not prohibit public employers from offering health benefits to their employees’ same-sex domestic partners. Yet CPM argued to this Court that the “plain language of Michigan’s Marriage Amendment” prohibits public employers from granting the benefits at issue.[52] Either CPM misrepresented the meaning of the amendment to the State Board of Canvassers and to the people before the election or it misrepresents the meaning to us now. Whichever is true, this Court should not allow CPM to succeed using such antics. The result of the majority’s disregard of CPM’s preelection statements is that, in the future, organizations may be encouraged to use lies and deception to win over voters or the Court. This should be a discomforting thought for us all.
CAVANAGH, J., concurred with KELLY, J.

 Const 1963, art 1, § 25.

 People v Harding, 53 Mich 481, 485; 19 NW 155 (1884).

 The amendment became effective December 18, 2004.

 After the amendment was passed, the interested parties entered into an agreement not to submit the proposed contract to the Civil Service Commission until a court determined whether the benefits were lawful.

 OAG, 2005-2006, No 7,171, p 9 (March 16, 2005).

 Plaintiffs include employees of (1) the state of Michigan, (2) the city of Kalamazoo, (3) the University of Michigan, (4) Michigan State University, (5) Eastern Michigan University, (6) Wayne State University, and (7) the Eaton/Clinton/Ingham Community Mental Health Board.

 Shortly after plaintiffs filed the suit, the city of Kalamazoo indicated that it would not provide benefits to same-sex domestic partners beginning in 2006 unless a court ruled them lawful. In response, Kalamazoo was added to the instant lawsuit as a defendant.

 Nat’l Pride at Work, Inc v Governor, unpublished opinion of the Ingham Circuit Court, issued September 27, 2005 (Case No. 05-368-CZ). The trial court did not consider the standing issue because the Attorney General did not raise the issue after the Governor withdrew her motion.

 Nat’l Pride at Work, Inc v Governor, 274 Mich App 147; 732 NW2d 139 (2007).

 478 Mich 862 (2007).

 Harding, 53 Mich at 485.

 Traverse City School Dist v Attorney General, 384 Mich 390, 405; 185 NW2d 9 (1971) (citations omitted).

 Federated Publications, Inc v Michigan State Univ Bd of Trustees, 460 Mich 75, 85; 594 NW2d 491 (1999).

 Baehr v Lewin, 74 Hawaii 530; 852 P2d 44 (1993).

 Id. at 580.

 Baker v State, 170 Vt 194, 197-198; 744 A2d 864 (1999).

 Goodridge v Dep’t of Pub Health, 440 Mass 309; 798 NE2d 941 (2003).

 Id. at 312, 342.

 Cal Fam Code 297.5(a).

 Plaintiffs appendix (Docket No. 133554), p 95c, reproducing a CPM webpage no longer available online.

 Id.

 In order for a proposal to be placed on the ballot, the Board of State Canvassers must certify it. MCL 168.476. Thus, the certification hearing was a very important step for CPM.

 The Governor’s appendix (Docket No. 133429), p 67a-68a, reproducing the transcript of the August 23, 2004, hearing.

 Id. at 69a.

 Charisese Jones, Gay marriage on ballot in 11 states, USA Today, October 15, 2004, p A.3.

 John Burdick, Marriage issue splits voters, Holland Sentinel, October 30, 2004.

 Plaintiffs’ appendix (Docket No. 133554), reproducing a CPM webpage no longer available online.

 CPM’s brochure, Protect Marriage, reproduced in the Governor’s appendix (Docket No. 133429), p 30a.

 Id.

 For full poll results, see the August 3, 2004, letter from Lake Snell Perry & Associates, Inc., to interested parties, reproduced as exhibit 10 of the amici curiae brief on appeal of various law professors at Michigan public universities.

 Twenty-four percent approved of making domestic partnerships and civil unions illegal.

 Twenty-seven percent approved of barring cities and counties from providing domestic-partner benefits.

 Twenty-nine percent approved of prohibiting state universities from offering domestic-partner benefits.

 The majority claims that I rely on extrinsic sources to trump the amendment’s language. As I will explain in more detail, my interpretation is consistent with the amendment’s language, not a trump card.
The majority attempts to justify its disregard of the extrinsic sources available by concluding that the “marriage amendment” is unambiguous. As can be discerned by any reader of the amendment, the vague language used is ambiguous in regard to the resolution of the question presented by this case. Clearly, the amendment does not unambiguously state whether public employers are barred from providing health benefits to their employees’ same-sex partners. It says nothing about these benefits. Accordingly, it is necessary to engage injudicial construction to resolve that question.
Since the amendment is ambiguous in regard to the proper resolution of the issue presented, I disagree with the majorify’s choice to ignore the extrinsic sources available. Because our goal is to discern the law that the people have made, when extrinsic sources exist that shed light on this intent, I believe it is essential to consider them. And given that every United States Supreme Court justice sitting today considers sources outside the language in ascertaining the correct interpretation of a constitutional provision, my methods are hardly unusual. Accordingly, contrary to the majorify’s allegations, it is not a “delegation of judicial responsibility from the courts to private interest groups” to consider these extrinsic sources. Ante at 84. It is a widely accepted means of interpretation.
But, my personal disagreement with the majorify’s methodology aside, I find remarkable its decision to turn a blind eye to the wealth of extrinsic information available. Consider the majority’s recent forays into constitutional interpretation: The majority did not hesitate to consult outside sources when interpreting a constitutional provision in People v Nutt, 469 Mich 565, 588-592; 677 NW2d 1 (2004), and in Lapeer Co Clerk v Lapeer Circuit Court, 469 Mich 146, 156-160; 665 NW2d 452 (2003). Though the majority protests my characterization of its actions in these cases, the simple *96 fact remains that its modus operandi is to consider extrinsic sources in some cases but not in others. The seemingly inconsistent approaches of the majority are baffling.

 It has been pointed out that, before the election, opponents of the amendment suggested that the amendment would prohibit the benefits at issue. These statements are relevant. But it does not follow that the opponents’ suggestion coupled with the election results shows that the people actually intended to prohibit the benefits. First, in determining a law’s meaning, one logically assumes that the statements of its drafters and lead supporters carry more weight than the concerns of those who voted against it. Second, it was the opponents’ suggestion that prompted the proponents to publicly state that the amendment would not bar the benefits at issue. Because the proponents’ statements were in response to the opponents’ suggestion, the statements become even stronger indicators of voter intent. The opponents’ suggestion indicates that there was confusion regarding what the amendment would prohibit. It is reasonable to assume that the public relied heavily on the proponents of the amendment to explain its meaning and scope.
The majority is “perplexed” by my conclusion that it is reasonable to afford the statements of the proponents more weight than the statements of the opponents. It appears that they do not agree with me that, if one wishes to understand the meaning of an author’s words, the best source is the author himseE The best source is not the author’s critics. Similarly, I believe it reasonable to conclude that, in deciding what the amendment’s language meant, the people turned to the organization that proposed the amendment. They did not turn to the organizations that were opposed to its approval.

 Const 1963, art 1, § 25.

 See OAG, 2005-2006, No 7,171, pp 14-15 (March 16, 2005).

 Maynard v Hill, 125 US 190, 205; 8 S Ct 723; 31 L Ed 654 (1888).

 Griswold v Connecticut, 381 US 479, 486; 85 S Ct 1678; 14 L Ed 2d 510 (1965).

 Hess v Pettigrew, 261 Mich 618, 621; 247 NW 90 (1933).

 See MCL 551.1; MCL 551.3; MCL 555.4; MCL 551.5; MCL 551.51.

 See MCL 551.101 through 551.103.

 See MCL 551.7; MCL 551.9; MCL 551.15; MCL 552.104; MCL 552.6 et seq.

 Maynard, 125 US at 211.

 MCL 557.204.

 MCL 552.18.

 MCL 600.2162.

 MCL 600.2922(3)(a).

 See plaintiffs’ appendix (Docket No. 133554), pp 16c-17c, reproducing a January 31,1997, letter from Barry R. Bedrick, Associate General Counsel, General Accounting Office, to the Honorable Henry Hyde, Chairman of the United States House Judiciary Committee, pp 1-2.

 It is by relying exclusively on the personal commitments expressed in the domestic-partnership agreements that the majority determines that the benefit programs at issue violate the amendment. The majority attempts to justify its disregard of the legal incidents that flow from the marital status by relying on the language “for any purpose.” It concludes that, because of this language, a union can be similar to marriage even if it carries with it none of the rights, benefits, or responsibilities of marriage. This is preposterous. The language “for any purpose” does not modify the word “similar.” It modifies the word “recognize”: “the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose." (Emphasis added.) Thus, it is error to conclude that the phrase “for any purpose” alters the word “similar.” In any event, as already discussed, the word “similar” requires a comparison of essentials. Essential aspects of a marriage include the legal incidents that flow from it. Therefore, it is not I who misreads the meaning of the word “similar” but the majority. It distorts the amendment’s language when it concludes that, in deciding whether a union is similar to marriage, the framers intended we consider solely the personal commitments expressed by individuals. The majority’s holding contradicts the amendment’s express purpose: “To secure and preserve the benefits of marriage for our society and for future generations of children ....” This language indicates that the amend *100 ment’s drafters and ratifiers did not ignore the important — perhaps more important — rights, benefits, and responsibilities of marital status. Nor did they intend to equate the sacred benefits of marriage with the mundane benefits of employment.

 This conclusion is consistent with the decisions of other state courts that have considered whether providing benefits to same-sex partners violates state laws regulating marriage. E.g., Slattery v New York City, 266 AD2d 24; 697 NYS2d 603 (1999); Tyma v Montgomery Co, 369 Md 497; 801 A2d 148 (2002); Lowe v Broward Co, 766 So 2d 1199 (Fla App, 2000).

 Amicus curiae brief on appeal of Citizens for the Protection of Marriage, p 1.