IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 18, 2012 Heard at Memphis

## JEAN ANN FIORAZO BECK v. JAMES MARTIN BECK

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-004891-04     Gina C. Higgins, Judge**

**No. W2011-01806-COA-R3-CV - Filed May 11, 2012**

This is a post-divorce action, concerning the Appellant Husband's obligation to pay alimony *in futuro* to Appellee Wife. Husband and Wife entered into a marital dissolution agreement ("MDA"), which was incorporated and made part of the final decree of divorce. The MDA provided that both parties would exchange tax returns each year and that, if these returns were not proferred, then alimony would be suspended until they were. Wife provided her tax returns after redacting her personal information. Husband concluded that the redaction was a breach of contract and, without prior court approval, unilaterally stopped making alimony payments. Because the MDA provision for alimony *in futuro* lost its contractual nature upon being incorporated into the trial court's order, and because Husband failed to obtain court approval before he suspended payments, we conclude that he lacked authority to stop those payments. Therefore, the award of arrears was proper. Affirmed and remanded.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Kevin A. Snider, Germantown, Tennessee, for the appellant, James Martin Beck.

Justin K. Thomas, Memphis, Tennessee, for the appellee, Jean Ann Fiorazo Beck.

### OPINION

After twenty-six years of marriage, Appellee Jean Ann Fiorazo Beck filed a complaint for absolute divorce against Appellant James Martin Beck. Therein, Ms. Beck alleged, *inter alia*, that, "[t]hroughout the course of the parties' marriage, Husband had been abusive to Wife, physically, verbally, and emotionally." Following the filing of the complaint for

divorce, the parties engaged in approximately three years of contentious litigation before they were divorced by final decree, entered on March 5, 2008. Prior to the entry of the divorce decree, the parties were able to agree on a Marital Dissolution Agreement ("MDA"), which was incorporated into the final decree of divorce. As is relevant to the instant appeal, the MDA provides, at Paragraph 1, that:

> Alimony. The Husband shall pay alimony in futuro, which shall be modifiable by the Court, taxable to Wife, and tax-deductible to Husband. The alimony shall cease upon Wife's death, remarriage, or cohabitation with anyone other than her son, or upon Husband's turning 65 years old. Husband shall pay $2,600.00 per month beginning on September 1, 2007 through the month of closing or six month, whichever occurs first. The $2,600.00 shall be payable as follows: Husband shall pay the mortgage, MLGW bill, association fee, car note, and car insurance directly to each creditor and shall pay $270.00 directly to Wife. Wife shall be responsible for payment of all of her other bills and shall hold Husband harmless and indemnify him on these debts. Husband shall pay Wife $2,000.00 per month beginning the month following the last $2,600.00 payment.

> At least one-half of the monthly support payments to Wife shall be paid on or before the first day of each month beginning September 1, 2007, and the remaining amount shall be paid by the 15th of each month by direct deposit. Wife shall provide Husband with deposit slips. Both parties shall provide the other party a copy of their tax return, including W-2's and supporting documents, by April 30 of each year. Provided Husband's gross income exceeds $80,000.00 per year, the following calculation shall apply: If the sum of Wife's gross income and alimony received exceeds the Husband's gross income minus alimony paid, this shall constitute a material change of circumstances and the Court shall reduce the alimony obligation to the extent that each party shall have the same amount of income including alimony payments. If Wife fails to produce her return, alimony payments shall be suspended until production.

More than two years after the divorce, on May 14, 2010, Mr. Beck filed a motion titled "Motion to Clarify." In his motion, Mr. Beck asks for clarification of Paragraph 1 of the MDA, *supra*. Specifically, Mr. Beck avers, in relevant part, that:

3. . . . [Mr. Beck] has had repeated and continuous problems with Wife producing her tax returns. In particular, the Wife has refused and/or otherwise failed to timely provide her tax return for the year of 2008 and when produced it was a "Tax Return Transcript" and not a true and correct copy of the signed tax return. In addition, for 2008, the Wife produced an unsigned copy of what appears to be her 2009 Form 1040 in which the Wife has unilaterally redacted her social security number (for which [Mr. Beck] does not have an issue with [sic]), her bank account information, her occupation, and employer and employment information from the attached W-2.

4. [Mr. Beck] would aver that the production of these two items (i.e., the 2008 Tax Return Transcript and the unilaterally redacted 2009 Tax Return— assuming that both of these documents are accurate, true and correct) are not in compliance with the requirements of the Marital Dissolution Agreement and/or [are] certainly not within the spirit and intent of the requirements of disclosure so that [Mr. Beck] can verify the accuracy of the tax returns and/or be provided a true and correct signed copy (which could greatly impact his alimony payment.).

It is undisputed that the motion to clarify was not served on Ms. Beck by private process or by certified mail. Rather, it was simply mailed to Ms. Beck's last known address. Ms. Beck contends that she did not receive notice of this motion or of the May 28, 2010 hearing scheduled as a result of the motion. Consequently, she failed to appear at the hearing on the motion to clarify. On June 30, 2010, the trial court granted Mr. Beck's motion, specifically ordering that copies of the tax returns "shall be provided to the other party in an unredacted form and any previously redacted returns, including W-2s and supporting documents, shall be provided to the other party in an unredacted form within sixty (60) days of the entry of this Order." However, we note that the June 30th order does not go so far as to order a suspension of alimony at that time.

On September 16, 2010, Mr. Beck petitioned the court for a finding of civil contempt against Ms. Beck. He stated that, although his attorney had sent a demand letter "addressed to [Ms. Beck], [she] had not yet produced her 2008 Federal and/or state Income Tax Return in a timely manner. . . ." Based upon this allegation, Mr. Beck informed the court that he had "suspended all alimony payments to [Ms. Beck] during the periods that she has refused and/or otherwise failed to produce her 2008 Federal Tax return along with supporting documentation." On March 24, 2011, Ms. Beck filed a response to the petition for civil

contempt. Therein, she alleged that she "ha[d] produced her 2008 and 2009 tax transcripts, which show her exact income for those years," and that "Mr. Beck [has] simply refus[ed] to pay. . . alimony." Ms. Beck further responded that "Mr. Beck was an abusive Husband," and that Ms. Beck "is in a witness protection type program for domestic violence victims in an undisclosed location." Consequently, Ms. Beck averred that Mr. Beck was seeking unredacted tax returns "so that he c[ould] find Ms. Beck." Concurrent with her response, Ms. Beck filed a counter-petition for civil contempt against Mr. Beck, alleging that Mr. Beck was "currently delinquent in his alimony payments in the approximate amount of $9,000.00." Also on March 24, 2011, Ms. Beck moved the court, under Tennessee Rule of Civil Procedure 60.02, to set aside the June 3, 2010 order granting Mr. Beck's motion to clarify Paragraph 1 of the MDA. In support of her motion, Ms. Beck asserted that she had not received service on the motion, and that she had received no notice of the hearing. Mr. Beck opposed all of Ms. Beck's motions.

All pending motions were heard on April 8, 2011. On July 19, 2011, the trial court entered its order, granting Ms. Beck's motion to set aside the order clarifying the MDA, denying Mr. Beck's motion for civil contempt, and granting, in part, Ms. Beck's counter-petition for civil contempt against Mr. Beck. The court further determined that Mr. Beck was in arrears on his alimony payments in the amount of $34,997.25. This amount was reduced to judgment as follows:

> 4. . . . Mr. Beck shall pay Ms. Beck $10,000.00 on or before August 12, 2011. With respect to the remaining arrearages still owed after application of the $10,000.00 payment, ($24,997.00), Mr. Beck shall pay $1,000 per month towards those arrearages beginning in July 2011 with the first payment due on or before July 30, 2011. This payment shall be in addition to the $2,000.00 per month in alimony that Mr. Beck is required to pay Ms. Beck pursuant to the parties' divorce.
>
> 5. The total amount due Ms. Beck each month ($2,000 alimony + $1,000.00 arrearage) shall be paid to Ms. Beck in equal installments of $1,500.00 on the 15th and 30th of each month until it is paid in full.

The trial court's order goes on to state that, "[f]rom this point forward, the parties shall exchange tax returns and W-2's each year and Ms. Beck shall be allowed to redact her personal address and telephone number from the tax return produced to Mr. Beck."

Mr. Beck filed a timely notice of appeal. However, upon initial review of the record,

this Court determined that the July 19, 2011 order was not final and appealable as it specifically reserved the issue of Ms. Beck's attorney fees. Upon order of this Court, on November 16, 2011, the trial court filed an order clarifying its July 19, 2011 order, and specifically denied Ms. Beck her attorney's fees. It appears that the order is now final for purposes of this appeal. Mr. Beck raises three issues for review as stated in his brief:

> 1. Whether the Court below erred in awarding suspended alimony retroactively to the Plaintiff Appellee Jean Fiorazo Beck once she provided all of her income tax return documents to the Defendant/Appellant James Martin Beck pursuant to the parties' Marital Dissolution Agreement.
>
> 2. Whether the Court below erred in setting aside the June 3, 2010 Order granting the Defendant/Appellant James Martin Beck's Motion to Clarify and/or Alter or Amend Paragraph Number 1 of the parties' Marital Dissolution Agreement and Reducing alimony arrearages to judgment.
>
> 3. Whether the court below erred in refusing to hold the Plaintiff/Appellant Jean Ann Fiorazo Beck in civil contempt for failing to comply with the orders of the Court.[1]

Because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

### Mr. Beck's authority to suspend payments under the MDA

As set out in full context above, the parties' MDA states that, "[i]f Wife fails to produce her return, alimony payments shall be suspended until production." We find nothing in this record to indicate that the trial court ever specifically ruled that Mr. Beck could suspend his alimony payments. In fact, as noted above, Mr. Beck is the one who informed the court in his petition for contempt that he had unilaterally suspended the alimony payments, presumably under some contractual authority arising from the MDA. But Mr. Beck's action begs the question of whether he had authority to suspend alimony without prior court approval. Although not specifically raised as an issue, we have determined that this

---

[1] We note that the attorneys, who are representing these parties on appeal, did not represent them at the trial level.

question is paramount to proper disposition of this appeal.  Therefore, pursuant to our authority under Tennessee Rule of Appellate Procedure 13(b), we will address the question *sua sponte*.[2]

The parties' MDA was incorporated and made part of the trial court's final decree of divorce.  Although, for purposes of interpretation, MDAs are treated as contracts, *see Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006), the question here is whether the MDA lost its contractual nature once it became the order of the trial court.   This Court first addressed the question of whether an MDA, which is incorporated into a court order, loses its contractual nature in ***Osborne v. Osborne***,  197 S.W.2d 234 (Tenn. Ct. App. 1946), stating:

> A case is here presented where childless parties to a marriage have entered into a valid agreement, after proper representation by able counsel and without any element of fraud or duress, which is incorporated into a decree awarding the plaintiff an absolute divorce. Is such an agreement a binding contract wherein the court in a divorce action is bound to adhere to?
>
> The general rule is that such agreements are merely evidential in value and may be followed by the court in its award of alimony—they should be given great consideration but are subject to close scrutiny by the court. When such agreements or their terms are adopted in the decree fixing alimony they are not absolute and binding when the court retains jurisdiction for their modification or the statute law of the state provides that such decrees remain open and subject to modification. 27 C.J.S., Divorce, § 234, p. 961. See notes in 58 A.L.R. 639, and 109 A.L.R. 1068, where numerous cases are collected. The author

---

[2] Tennessee Rule of Appellate Procedure 13(b) provides:

> **(b) Consideration of Issues Not Presented for Review**. Review generally will extend only to those issues presented for review. The appellate court shall also consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review, and may in its discretion consider other issues in order, among other reasons:  (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process.

states that the above rule is supported by the weight of authority.

'Other contracts may be modified, restricted, or enlarged, or entirely released upon the consent of the parties. Not so with marriage. The relation once formed, the law steps in and holds the parties to various obligations and liabilities. It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress.' *Maynard v. Hill*, 125 U.S. 190, 8 S. Ct. 723, 729, 31 L. Ed. 654.

A divorce action is really a triangular proceeding where in addition to the parties the State through the court is a quasi party. It is for this basic reason that the courts afford the fullest possible hearing in the matter and at all times must guard against collusion, fraud and any unfair practice or undue advantage that one party might take of the other. Adhering to these principles the courts do not take the agreements of the parties as conclusive but merely use them as a basis on which an alimony decree is fixed. When the circumstances of the parties change the court's decree may be changed. Code, section 8446, provides among other things that, 'the order or decree to remain in the court's control; and, on application of either party, the court may decree an increase or decrease of such allowance on cause being shown.' In *Davenport v. Davenport*, 178 Tenn. 517, 160 S.W.2d 406, the court held that the above Code section and section 8454 is incorporated in every divorce decree. The decree in the instant case retains the matter on the docket and open for modification.

*Id*. at 236. Relying upon the *Osborne* holding, in *Penland v. Penland*, 521 S.W.2d 222 (Tenn. Ct. App. 1975), this Court explained:

[F]rom a careful reading of *Osborne v. Osborne*. . . it is clear that the reason for stripping the agreement of the parties of its contractual nature is the continuing statutory power of the Court to modify its terms when changed circumstances justify. It follows, and we so hold, that only that portion of a property settlement agreement between husband and wife dealing with the legal duty of child support, or alimony over which the court

-7-

has continuing statutory power to modify, loses its contractual nature when merged into a decree for divorce.

*Id*. at 224.[3]

The merger of MDA provisions into court orders is succinctly addressed in Janet Richards, *Richards on Tennessee Family Law*, § 13-9, wherein she explains:

> A Court has the authority to modify its own orders pertaining to custody and support, even if the provisions of the court's order were incorporated by reference from the parties' MDA. The provisions of the marital agreement are merged into the decree and lose their contractual nature to the extent that they address matters over which the court has continuing statutory power to modify.
> On the other hand, those provisions that are not within the power of the court to modify do not lose their contractual nature upon incorporation into the decree. Additionally, the court may not modify such provisions because to do so would violate the constitutional prohibition against interference with contracts.

---

[3]  To avoid confusion, we note that the foregoing analysis does not apply to awards of alimony *in solido*, but only to awards (such as the one in the instant case) of alimony *in futuro*. As explained by this Court in **Dennis v. Dennis**, No. CA-45, 1986 WL 7608 (Tenn. Ct. App. July 9, 1986), *perm. app. denied* (Tenn. Jan. 5, 1987):

> [T]he alimony awarded respondent by the divorce decree. . .is clearly alimony *in solido*. The Trial Judge, after the expiration of thirty days, no longer had jurisdiction to make any modification in the award of alimony *in solido*.

> ***

> The cases relied upon by the Plaintiff are inapposite. The principal one is **Osborne v. Osborne**, 29 Tenn. App. 463, 197 S.W.2d 234 (1946), but in that case it is apparent that the award was for periodic alimony, not alimony *in solido*.

*Id*. at *2.

-8-

***Id***.  (footnotes omitted).

Based upon the foregoing authority, the parties' MDA, insofar as it addresses alimony *in futuro* payments, lost its contractual nature when it became the trial court's order. Mr. Beck, therefore, had no contractual right to treat Ms. Beck's alleged failure to provide tax returns as a suspensory condition, i.e., a "condition[] precedent that suspend[s] the operation of a contractual promise [in this case, Mr. Beck's promise to pay alimony] until those conditions are met." Bryan A. Garner, <u>A Dictionary of Modern Legal Usage</u> 862 (2nd ed. 1995).  In short, the decision whether to suspend, modify, or terminate alimony *in futuro* was not Mr. Beck's to make; it was the trial court's.  The fact that the trial court somehow overlooked its authority in this matter is not fatal to its conclusions.  The trial court appears to have incorrectly treated the MDA as a contract.  Although its reasoning was incorrect, the trial court ultimately reached the correct result—i.e., that Mr. Beck was never relieved of his obligation to pay alimony and could, therefore, properly be charged with arrears. ***Shutt v. Blount***, 249 S.W.2d 904, 907 (Tenn. 1952) ("If the Trial Judge reached the right result for the wrong reason, there is no reversible error.").  We reach the same conclusion regardless of whether Ms. Beck complied with the tax return requirement.  This is because neither Ms. Beck, nor Mr. Beck could usurp the trial court's authority by treating the MDA provisions on alimony as a contract between them and not as a direct order of the court.  In short, even if Ms. Beck was in contempt, that fact does not function as a suspensory condition to stop the alimony payments unless and until the trial court orders that it does. The trial court in this case never ordered suspension of the alimony payments. Therefore, Mr. Beck was not entitled to suspend Ms. Beck's alimony. Accordingly, the trial court's award of $34,997.25 to Ms. Beck was proper.

## Rule 60.02 Motion

We next consider Mr. Beck's argument that the trial court erred in granting Ms. Beck's Tennessee Rule of Civil Procedure 60.02 motion to set aside the June 3, 2010 order. As noted above, when Ms. Beck failed to appear for the hearing on Mr. Beck's motion to clarify, the trial court entered judgment against her.  Tennessee Rule of Civil Procedure 55.01 provides that, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules. . .default may be entered [against that party]."  However, Tennessee Rule of Civil Procedure 55.02 provides that, "[f]or good cause shown[,] the court may set aside a judgment by default in accordance with Rule 60.02."

Rule of Civil Procedure 60.02 provides, in relevant part, that:

On motion and upon such terms as are just, the court may relieve

a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect. . .(5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1) and (2) not more than one year after the judgment, order or proceeding was entered or taken. . . .

Tennessee law is clear that the disposition of motions under Rule 60.02 is best left to the discretion of the trial judge. *Underwood v. Zurich Ins. Co.*, 854 S.W.2d 94, 97 (Tenn. 1993); *Banks v. Dement Constr. Co.*, 817 S.W.2d 16, 18 (Tenn. 1991); *McCracken*, 958 S.W.2d at 795. The standard of review on appeal is whether the trial court abused its discretion in granting or denying relief. This deferential standard "reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives," and thus "envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal." *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). Here, the trial court set aside the June 3, 2010 order on the ground that the motion for clarification, which gave rise to that order, was not properly served on Ms. Beck, and that she did not otherwise receive notice of the hearing on that motion. We agree.

It is undisputed that Mr. Beck did not attempt to issue a new summons to Ms. Beck on the motion to clarify, nor did he send the copy of that motion by certified mail. Rather, Mr. Beck simply used regular mail to send the motion to Ms. Beck's last known address. In *Wilson v. Blount County*,207 S.W.3d 741 (Tenn. 2006) the Tennessee Supreme Court reiterated that service by mail requires that a copy of the summons and complaint be sent by certified or registered mail, not merely by regular mail. That being said, failure to properly issue new service of process is not fatal to Mr. Beck's motion. Rather, as discussed in 1 Lawrence A. Pivnik, Tennessee Circuit Court Practice § 9:21 (2011):

By statute, a court that has granted a divorce decree, based on personal jurisdiction and personal service or substitute service, generally has continuing jurisdiction to entertain petitions to modify or alter its orders regarding support and custody, including visitation rights, regardless of one party's change of residence to another state. When a petition to modify or alter is filed, a new original summons is not required since the parties are already before the court, but notice of the petition must be given to the adverse party in a manner reasonably calculated to actually inform him of the pendency of the modification

-10-

petition.

*Id*. (Footnotes omitted). In *Jarvis v. Jarvis*, 664 S.W.2d 694 (Tenn. Ct. App. 1983), this Court explained:

> Since jurisdiction is continuing, notice requirements upon commencement of an action to modify or enforce the decree are not so stringent as those for a new action. *Sowell v. Sowell*, 493 S.W.2d 86 (Tenn. 1973); *Burden v. Burden*, 44 Tenn. App. 312, 313 S.W.2d 566 (1957); *Darty v. Darty*, 33 Tenn. App. 321, 232 S.W.2d 59 (1949). All that is required is that the adverse party be given "reasonable notice," *Darty v. Darty*, 33 Tenn. App. 321, 232 S.W.2d 59, 61; that is, "such as one desirous of actually informing the absent party might reasonably adopt." *Burden v. Burden*, 44 Tenn. App. 312, 313 S.W.2d 566, 570 (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S. Ct. 652, 94 L.Ed. 865). The issue before us is whether this "fairness" test, *Sowell v. Sowell*, *supra*, has been met in this case.

*Jarvis*, 664 S.W.2d at 696; *accord* 19 W. Walton Garrett, Tennessee Practice: Divorce, Alimony & Child Custody § 20:7 (2011–2012 ed.).

Ms. Beck argued that she received no notice of the hearing and that she, therefore, had no opportunity to be heard on the question of whether redacted tax returns were sufficient. We find nothing in the record to dispute her contention. The only "notice" was the attempted service of the motion itself by regular mail. Ms. Beck contends that she never received this piece of mail. In the absence of any return receipt or other documentation to show that Ms. Beck was noticed on the motion or the hearing, we cannot conclude that the trial court erred in setting aside the default judgment entered against her. Because she received no notice of the May 28, 2010 hearing, Ms. Beck had no opportunity to inform the trial court of her reason for redacting the tax returns (i.e., because she was allegedly abused, she wished to keep her whereabouts from Mr. Beck) before default judgment, requiring her to submit unredacted returns, was entered. As stated by our Supreme Court, in *Henry v. Goins*, 104 S.W.3d 475 (Tenn. 2003), default judgments are not favored in Tennessee:

> [D]efault judgments are drastic sanctions. *See United Coin Meter Co. v. Seaboard Coastline R.R.*, 705 F.2d 839, 845 (6th Cir. 1983); *Barish v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 627 S.W.2d 953, 955 (Tenn. Ct. App. 1981).

-11-

Neither dismissals nor default judgments are favored by the courts. *See Barbee*, 689 S.W.2d at 866; *Mfrs. Consolidation Serv., Inc. v. Rodell*, 42 S.W.3d 846, 864 (Tenn. Ct. App. 2000). Dismissals based on procedural grounds like failure to prosecute and default judgments run counter to the judicial system's general objective of disposing of cases on the merits. *See, e.g., Childress v. Bennett*, 816 S.W.2d 314, 316 (Tenn. 1991) (observing that "it is the general rule that courts are reluctant to give effect to rules of procedure ... which prevent a litigant from having a claim adjudicated upon its merits"); *Barbee*, 689 S.W.2d at 866 (stating that in the interests of justice, courts express a clear preference for a trial on the merits).

Rule 55.02 of the Tennessee Rules of Civil Procedure permits trial courts to set aside default judgments in accordance with Rule 60.02. Courts construe requests for relief pursuant to Rule 60.02 much more liberally in cases involving default judgment than in cases following a trial on the merits. *See Barbee*, 689 S.W.2d at 866; *Nelson v. Simpson*, 826 S.W.2d 483, 485 (Tenn. Ct. App. 1991). A request to vacate a default judgment in accordance with Rule 60.02 should be granted if there is reasonable doubt as to the justness of dismissing the case before it can be heard on its merits. *See Nelson*, 826 S.W.2d at 486. A request to vacate an order of dismissal pursuant to Rule 60.02 should be granted under the same circumstances. Such liberality is especially warranted when an order of dismissal is entered with prejudice and without such procedural safeguards as notice, considering that Rule 55.01 of the Tennessee Rules of Civil Procedure requires notice to be given before a default judgment is granted.

*Henry*, 104 S.W.3d at 481.

These principles apply to the instant case. Because Ms. Beck received no notice of the hearing, and because she did not have the opportunity to present her case, we conclude that it would have been error for the trial court to deny her Rule 60 relief. The grant of Rule 60 relief allowed Ms. Beck the opportunity to present evidence so that the trial court could decide the issue on the merits. We conclude that the trial court's decision was in the best interest of fair play and substantial justice and, therefore, we decline to hold that the grant

-12-

of the Rule 60.02 motion was error.  In addition, from the evidence presented, we conclude that the trial court properly determined that Ms. Beck could provide redacted tax returns going forward.  We pretermit all remaining issues.

It is, therefore, ordered and adjudged by this Court that the judgment of the trial court is affirmed.  Costs on appeal are taxed to the Appellant, James Martin Beck, and his surety. The case is remanded, pursuant to applicable law, for collection of costs for all of which execution may issue, if necessary.

_____

J. STEVEN STAFFORD, JUDGE